## PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC., Plaintiff

v.

## Anthony GITTENS and The District of Columbia, Defendants.

### No. CIV. 02–0984(RJL).

United States District Court, District of Columbia.

Aug. 7, 2002.

---

Arthur Barry Spitzer, Washington, DC, for plaintiff.

Martha Jane Mullen, Robert C. Utiger, Office of Corp. Counsel, D.C., Washington, DC, for defendants.

### MEMORANDUM OPINION

LEON, District Judge.

The City of Washington, D.C. ("the City") through its Commission on Arts and the Humanities ("DCCAH" or "the Commission"), began organizing a public art exhibit last year, the purpose of which was to showcase the "whimsical and imaginative side of the Nation's Capital", to make "public art acceptable, increase tourism, and to have FUN." [1]

According to Anthony Gittens, the executive director of the DCCAH, the project, which featured a citywide display of elephant and donkey "theme icons" [2] was "designed to be festive and whimsical, reach a broad based general audience and foster an atmosphere of enjoyment and amusement." [3]

The promotional materials distributed by the Commission to potential artists and sponsors specifically prohibited original designs which contained "direct advertising of any product, service, company name and social disrespect." [4]

Over a thousand entrants were submitted for the Commission's consideration, and several hundred were selected to be

---

1. Pl.'s Mem. Supp. Prelim. Inj. Ex., "Party Animals Call to Artists" materials.

2. "Theme icons" are the polyurethane icons either in the shape of an elephant or donkey that were distributed to each participant in Party Animals for decoration. Each icon is

four and one half feet tall, and five feet long. *Id.*

3. Anthony Gittens 3d Decl. ¶ 3; Gittens 1st Decl. ¶ 14.

4. *See supra* note 1.

displayed between April and September of this year. Some of those selected, and currently on display, contain messages set forth in varying ways upon them. In some cases the messages appear to be the principal focus of the painting,[5] in others the message is subsumed within the overall artistic presentation.[6] In all such cases, however, the City contends, in essence, that these paintings are artistic impressions consistent with the theme and objectives of its art project, as described above.

People for the Ethical Treatment of Animals ("PETA") submitted a number of proposals for inclusion in the project; the last of these proposals, which was rejected by the Commission on July 2, 2002, is the subject of the amended complaint pending before this Court. PETA's proposed entrant features an elephant with tears coming from its eyes, a shackle on its front right leg and a multicolored blanket on its back that contains the words embroidered therein: "The CIRCUS Is Coming, See SHACKLES—BULL HOOKS—LONELINESS All Under The 'Big Top'."

PETA contends that its proposed entrant was rejected because of the content of the message on the blanket, *not* for the reasons stated by the Commission: that is, that it is not art, but a "political billboard" inconsistent with the themes and objectives of the art program.[7] Indeed, PETA claims that, under the First Amendment,

the Commission cannot engage in content based discrimination in a limited public forum, such as this, unless it does so *reasonably*. It claims that the Commission's rejection of its proposed design was *not* reasonable because it was *inconsistent* with the Commission's selection and display of other entrants whose messages are equally, or more, noncompliant with the stated themes and objectives of the project.

PETA seeks a preliminary and permanent injunction compelling the Commission to display its entrant in a prominent location in the City as required by the terms of the $5,000 entry fee it submitted to the Commission.

For the reasons set forth below, the Court has concluded that the Commission's rejection of PETA's entrant was unreasonable because of its inconsistent treatment of other similarly noncompliant entrants. The Court has concluded that this inconsistency was inherently unreasonable and therefore constituted impermissible discrimination in violation of the First Amendment. Accordingly, the Court hereby Orders the Commission to display PETA's entrant as soon as it is ready for viewing[8] in a prominent location in the City, consistent with the terms of the $5,000 sponsorship fee it paid to the Commission, for the duration of the Party Animals exhibit.

---

**5.** For example, the Commission displayed an elephant design showing children of different skin colors displaying the slogan "Our Differences Make Us Strong" and "Children United In Peace," and a donkey design also showing children of different colors holding hands with a slogan stating "We Are Colorblind." In addition, an elephant design was accepted which was named "GOPoly" after the "Monopoly game," and showed a painted gameboard with spaces named "$TAX CUT$" and "SOCIAL SECURITY?" and "IN GOP WE TRUST."

**6.** An elephant was accepted by the Commission that was decorated in a mosaic pattern with a panel near its tusk that states "Just Say No To Ivory."

**7.** Pl.'s Am. Compl., Ex. F, Gittens 3d Decl. ¶ 3.

**8.** At the hearing on July 17, 2002, counsel for PETA and the Commission both indicated that the elephant design had not yet been painted on the polyurethane icon. The Court expects that this will be accomplished expeditiously after the issuance of its Order, if it has not been done already.

## THE PARTY ANIMALS EXHIBIT

There were two ways to participate in the Party Animals exhibit: the first was through a "Call to Artists" competition, and the second was through a sponsorship donation. For the "Call to Artists" competition, artists were asked to submit design concepts. All design submissions were subject to the approval of the Commission, which reviewed and selected the designs of the artists who participated in the competition. A selection committee ("the Committee")[9] chose the winning designs, and the artists of those designs were provided with a donkey or elephant sculpture to decorate and awarded an honorarium. The Commission estimates that it received approximately 1,200 entries, of which it rejected over 800.[10]

The sponsorship route involved four different levels of contribution. For $2,000, a contributor was designated a "Governor," and could select a design from among the "Call to Artists" submissions already chosen by the Committee. For an additional $1,000, a contributor was designated a "Senator," and was permitted to select a design from the "Call to Artists" group, plus have its "Party Animal" placed in a prime location. For $5,000, however, the sponsor, who was dubbed a "President" sponsor, was not limited to the "Call to Artists" designs approved by the selection committee. Indeed, a Presidential sponsor could 1) choose his or her own artist; 2) choose a donkey or elephant to decorate;

and 3) select a prominent public location to display its "Party Animal." Finally, contributors who donated $20,000 or more were designated "Founders" and had all the benefits of a Presidential sponsor, plus they received recognition of their contribution in all publications, including the auction of the elephant and donkey icons which will take place at the close of the exhibit.

With respect to criteria for the designs submitted either through the Call to Artists competition or the sponsorship route, the materials distributed to artists and sponsors were limited, but specific. In a section of the materials entitled "The Artwork," the Commission explained that it was "looking for artwork that is dynamic and invites discovery." It stated that the "intended audience" of the Party Animals exhibit would be "D.C. residents and visitors of all ages and backgrounds." In addition, the Commission specified that the "artwork must be durable, safe and require minimal maintenance." Most importantly, the Commission stated that it was seeking "original and creative designs," but "does not call for or allow direct advertising of any product, service, a company name or social disrespect." It warned that "there will be restrictions against slogans or inappropriate images." In addition, in the general information section of the promotional materials entitled "Candidates for Party Animals," the Commission stated that it "reserves the right to design approval,"[11] but did not specifically explain

9. The Committee was responsible for evaluating all designs submitted through the "Call to Artists" competition; the Commission, however, as evidenced by both parties' pleadings, was the entity that evaluated PETA's design submissions. Just as both plaintiff's and defendants' pleadings identify the Commission, and not the Committee, as the body who evaluated PETA's design submissions, this memorandum opinion will do so as well.

10. June 25, 2002, Hr'g Tr. at 37, ll. 3–4.

11. In addition, a letter attached to the "Candidates for Party Animals" materials described the "Party Animals" as "creative and whimsical," and that the display would be an "opportunity to ... [e]nliven our streets with creative, humorous art." *See* Defs.'s Ex. D. The statements of Commission's executive director, Anthony Gittens, provide further explanation of the Party Animals criteria and how they are interpreted by the Commission. In his initial declaration, Gittens stated that

what criteria would be applied when reviewing sponsors' designs.

## PETA'S PARTICIPATION IN THE PARTY ANIMALS EXHIBIT

PETA is a nonprofit organization with approximately 750,000 members,[12] and advocates the philosophy that animals are "not ours to eat, wear, experiment on, or use for entertainment."[13] Among the many animal rights campaigns which PETA wages is the effort to educate the public about alleged abuse of animals by circuses.[14]

PETA apparently viewed the Party Animals exhibit as an excellent opportunity to advance its message in the nation's capital.[15] Notwithstanding the stated purposes and objectives of the Party Animals exhibit, on March 18, 2002, PETA submit-

ted a letter stating its intent to be a sponsor, the locations where PETA preferred its elephant to be displayed, and a $5,000 check to the Commission for the Party Animals display. The deadline for submissions, however, had expired on January 25, 2002. Nonetheless, the Commission told PETA that it could still participate at the $5,000 sponsorship level.[16]

On March 21, 2002, PETA submitted as its design concept a cartoon from *The New Yorker* magazine depicting a frowning elephant with a gentleman standing on a ladder nailing a sign into its side that read: "The Circus is Coming. See: Torture Starvation Humiliation, All Under the Big Top."[17]

The Commission rejected PETA's initial design on March 22, 2002, and the parties dispute what the Commission told PETA

the purpose of Party Animals is to "promote the arts, encourage tourism, and foster an atmosphere of enjoyment and amusement." He also stated that the Commission "retained discretion to eliminate any designs that lacked artistic value, showed social disrespect or conveyed controversial messages." Gittens 1st Decl. ¶ 14. Finally, Gittens confirmed statements made in the promotional materials that the Party Animals display was designed to be "festive and whimsical." Gittens 2d Decl. ¶ 9; Gittens 3d Decl. ¶ 3.

12. *See* Pl.'s Am. Compl. ¶ 3.

13. *Id.*

14. *See id.* at ¶ 14. In that regard, PETA claims that circus elephants are "unhappy and deprived animals ... forced to perform uncomfortable, confusing and often painful acts over and over again under threat of thrashings with a bull hook." Pl.'s Mem. Supp. Prelim. Inj. at 4. PETA also maintains that circus elephants are forced to live in unsanitary and unsafe conditions, that make them susceptible to various illnesses such as tuberculosis. *See id.*

15. *See* Pl.'s Mem. Supp. Prelim. Inj. ¶ 4 (stating that "[w]hen PETA learned of the Party Animals event, it decided to become a sponsor at the 'President' level so that it could choose

its own artist and submit its own design in furtherance of its goal of educating the public about the treatment of elephants in circuses."); *see also* Patrick McVicker Decl. ¶ 6 (stating that PETA made the choice to participate in Party Animals as a President sponsor "in order to communicate with the public in our nation's capital about the mistreatment and torment of circus animals").

16. *See* Alexandria MacMaster Decl. ¶ 2. While Alexandria MacMaster, an employee of the Commission, told PETA that it was too late to participate in the Call to Artists competition, PETA could still participate as a sponsor.

17. *See* Defs.'s Ex. G. PETA did not follow the guidelines for submission of designs for the Commission's approval. While PETA submitted a cartoon from *The New Yorker*, the Commission required that all artists and sponsors submit designs on a on the template provided in the "Call to Artists" materials. *See* Pl.'s Mem. Supp. Prelim. Inj. Ex., "Party Animals Call to Artists" materials. Participants were required to submit a front and side view of the Party Animal, a brief description of the donkey or elephant, and a resume of the artist who would complete the decoration of the Party Animal. *See* Pl.'s Mem. Supp. Prelim. Inj. Ex., "Party Animals Submission Form."

regarding the rejection of PETA's design submission. PETA claims that the Commission's Executive Director, Anthony Gittens, told a PETA official during a telephone call that the initial design was rejected not because of the content of the message, but because " 'it had a message at all.' " [18] Further, according to PETA, Gittens told PETA that " '[t]he Commission is not looking to make any statements,' " and that it was "rejecting all designs with 'messages.' " [19] While Mr. Gittens has not denied Penzer's allegation, despite repeated opportunities to do so, the Commission provides a different reason for the rejection. According to the Commission, it was "obvious" that the design was "inappropriate" for the Party Animals exhibit, and did not comply with the rules of the competition nor "compliment the spirit of the ['Party Animals'] project." [20] Alexandria J. MacMaster, the Art and Public Place Consultant for the Commission, stated that she personally informed PETA by telephone that its initial design was "unacceptable." [21]

In order to determine whether its explanation was the real reason for the initial rejection, PETA submitted on April 3, 2002, two, additional designs, and asked the Commission if either one would be acceptable. This time, PETA did not submit a cartoon but an artist's drawing on the appropriate application template, as called for by the Commission. One design depicted a "happy" circus elephant who is smiling and wearing a plumed headdress and a decorative blanket over its back emblazoned with the word "CIRCUS." [22] The second design depicted a "sad circus elephant" with a shackle on its right front leg, a trainer standing next to it poking it with a bull hook,[23] and a tear running from its eye. The "sad circus elephant" is also wearing the same blanket and headdress as the happy elephant.

On April 4 or April 5, 2002, the Commission informed PETA by telephone that the happy elephant design was accepted, but the sad elephant design was not.[24] On April 9, 2002, PETA's counsel contacted the Commission's counsel to discuss the Commission's action. On April 16, 2002, the Commission's counsel in an attempt to bridge the gap proposed a "compromise sad circus elephant" design which would consist of PETA's "sad circus elephant" design *without* the trainer and the bull hook. In that context, the Commission apparently explained that the elimination of the trainer and bull hook was necessary to avoid structural, maintenance or safety problems.[25]

---

18. *See* Matthew Penzer Decl. ¶ 4.

19. *See id.*

20. *See* MacMaster Decl. ¶ 11; Defs.'s Ex. C, at 4.

21. *Id.*

22. *See* Defs.'s Ex. at I–2.

23. A bull hook is also referred to as an "ankus." An ankus is defined as a "an elephant goad used in India having a sharp spike and hook and resembling a short-handled boat hook." *Webster's Third New International Dictionary Unabridged* (2002).

24. *See* MacMaster Decl. ¶ 13. The Commission claims that the sad circus elephant design was rejected because it was "too literal and not in step with the project." *Id.*

25. In its Memorandum in Support of its Motion for a Preliminary Injunction, plaintiff alleges that the Commission explained that the bull hook and trainer must be eliminated because they "presented structural, maintenance or safety problems." *See* Pl.'s Mem. Supp. Prelim. Inj. at 6. This assertion is consistent with the criteria contained in the "Call to Artists" materials which state that "artwork must be durable, safe and require minimal maintenance.... Additional decorative embellishments or appendages added ... must withstand human weight, tugging, and surface abrasions". *See* Pl.'s Mem. Supp. Prelim. Inj. Ex., "Party Animals Call to Artists" materials. Defendants, however, have

Although it initially led the Commission to believe that it would proceed with the happy elephant design, PETA ultimately rejected the "compromise sad circus elephant" design and submitted, through counsel on April 19, 2002, its second "sad circus elephant" design. Like the cartoon from *The New Yorker*, this elephant had tears coming from its eyes and a shackle on its front right leg. Gone, however, was the headdress, blanket, and the freestanding trainer brandishing a bull hook. In its place was a sign tacked to the elephant's side with blood droplets coming from the tacks. The sign read: "The CIRCUS is Coming, See SHACKLES—BULL HOOKS—LONELINESS All Under the 'Big Top.'" In essence, this design combined elements of PETA's initial *New Yorker* cartoon submission, and its second "sad circus elephant" design which the Commission had previously rejected.

The Commission rejected PETA's second sad circus elephant design that very day. According to Executive Director Gittens, it was rejected because it was not art, but a "political billboard" meant to promote a single issue.[26] Further, Gittens declared that PETA's second sad circus elephant design "was not an artistic expression consistent with the goals, spirit and theme of the art project."[27] According to the Commission, PETA's "proposed design did not compliment these goals, and indeed was contrary to the Party Animals' expressive, economic, aesthetic, and civic purpose."[28] PETA was informed of the rejection by the Commission's counsel, Martha Mullen.[29]

Four days after PETA's last rejection, on April 23, 2002, the Party Animals exhibit opened in Washington, D.C. Within a week of the opening, PETA's counsel from the ACLU dispatched a legal assistant to photograph the Party Animals entrants that had been selected by the Commission and were awaiting placement throughout the City. Based in part on these photographs, PETA filed its initial lawsuit against the City and the Commission's Executive Director, Anthony Gittens, on May 22, 2002. Included in PETA's papers was a set of colored photographs of over twenty entrants which it claimed contained a wide variety of messages, thereby undercutting Gittens' earlier alleged representation that no messages would be allowed.[30] For example, PETA in its initial papers points to an elephant design showing children of different skin colors holding hands and displaying a painted slogan in large letters: "Our Differences Make Us Strong." They also point to a donkey design also showing children of different colors with a boldly painted slogan stating "We Are Colorblind." Another design they highlight features an elephant painted on one side with a map showing the location of the Pentagon, and on the other with a map showing the location of the World Trade Center, and carrying in its trunk a

never provided an affidavit to the plaintiff explicitly stating that this was the reason for its objections to the trainer and bull hook, even though the plaintiff requested its reasons for rejection in writing. *See* McVicker Decl. ¶ 14. Indeed, the Commission refused to provide written explanations of its rejections of PETA's earlier entrants despite requests by PETA to do so. It was not until the Court, on June 25, 2002, required the Commission to place its reasons in writing for rejecting PETA's second sad circus elephant design that it finally did so.

26. *See* Gittens 2d Decl. ¶ 9.

27. *Id.*

28. *Id.*

29. *See supra* note 25 and accompanying text (regarding the Court's order that the Commission provide a written explanation regarding its reasons for rejecting PETA's second sad circus elephant design).

30. *See* Penzer Decl. ¶ 4.

bouquet of roses and tags with the names of September 11 victims. The word "Freedom" is painted on the elephant's side. In addition, an elephant design was accepted which was named "GOPoly" and showed a modified "Monopoly" gameboard with spaces named "$TAX CUT$" and "SOCIAL SECURITY?" and "IN GOP WE TRUST." Finally, PETA highlighted an elephant decorated in a mosaic pattern that has a panel near its tusk that states "Just Say No To Ivory."

When oral argument was heard on the initial complaint on June 25, 2002, the Court requested that the Commission provide in writing its reasons for rejecting PETA's last design so that it could have a written record to review. In addition, the Court allowed PETA a four day period thereafter to amend its pleadings in response to the expected written explanation. On July 2, 2002, PETA informed the Court that it had, in the interim, submitted a third sad elephant design for the Commission's consideration. It claimed to have done so in response to issues regarding its prior entrants that arose during the oral argument. In addition, it filed a consent motion for leave to file its "response" until two days after the Commission acted upon its most recent entrant. PETA's third, and final, sad circus elephant design ("final design" or "final sad circus elephant design") was essentially the same as its immediate predecessor, except that the tacked-on sign was replaced by a multicolored blanket that had embroidered therein the exact same words as the tacked-on sign, and the elephant was wearing a decorative headdress. The Court granted the motion. On July 9, 2002, the Commission informed PETA, through counsel, that its final design was rejected. On July 15, 2002, Mr. Gittens provided a written declaration explaining this decision. It is this final design that is now before the Court.

At the Court's direction, PETA filed a consent motion to amend its complaint on July 16, 2002. The consent motion was granted that day and a supplemental oral argument was held on July 17, 2002. During that argument, the Commission continued to assert that although it had accepted numerous entrants that contained messages, these entrants were examples of "good ... art," and that PETA's was not.[31] Moreover, with regard to those entrants it had accepted that were clearly not "whimsical," or "festive" designs meant to foster "amusement" and "fun," the Commission's counsel offered no additional explanation of why those designs were acceptable, even though inconsistent with the Commission's stated theme and objectives, and PETA's was not. In short, this Court is left to evaluate, constitutionally, whether or not the Commission's inconsistent treatment of PETA's most recent entrant was "reasonable," and not unconstitutional discrimination based on the content of its message.

## STANDARD OF REVIEW

Plaintiff seeks a preliminary and permanent injunction ordering the defendants to accept its latest sad circus elephant design in the Party Animals public art exhibit, and to display plaintiff's design in an "appropriate prime location." *See* Pl.'s Mem. Supp. Prelim. Inj. at 1. To succeed, PETA must demonstrate the following four factors: 1.) a substantial likelihood of success on the merits; 2.) that it would suffer irreparable injury if the defendants are not enjoined; 3.) that an injunction would not substantially injure other interested parties, and 4.) that the public interest favors issuing an injunction. *See City-Fed Financial Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C.Cir. 1995); *Mova Pharmaceutical Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C.Cir. 1998).

---

**31.** July 17, 2002, Hr'g Tr. at 23, II. 8–9.

The first prong of the four-part test for a preliminary injunction under *CityFed*—a substantial likelihood of success on the merits—is the most important for the purposes of the Court's analysis. Ultimately, PETA's ability to satisfy the "irreparable injury" and "public interest" requirements for a preliminary injunction hinges on whether it can show that Commission's rejection of its final "sad circus elephant" design was a violation of plaintiff's First Amendment rights. The Supreme Court in *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), stated that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" where the injury is "both threatened and occurring" at the time of plaintiff's motion for a preliminary injunction. *Id.* at 374, 96 S.Ct. 2673. *Accord, National Treasury Employees Union v. United States*, 927 F.2d 1253, 1254 (D.C.Cir.1991), *Wagner v. Taylor*, 836 F.2d 566, 576 n. 76 (D.C.Cir. 1987). Not only does plaintiff's irreparable injury argument depend on establishing a violation of First Amendment rights, plaintiff argues that the public interest favors a preliminary injunction whenever First Amendment rights have been violated.

As plaintiff's First Amendment claim is determinative of its ability to satisfy the test for a preliminary injunction, it is necessary to begin with an analysis of First Amendment doctrine regarding restrictions placed on speech by the government. Any time the government places restrictions on speech in public forums, the standard of judicial scrutiny applied by the Court in order to determine whether the restrictions are unconstitutional depends on the nature of the forum. *See Good News Club, et al, v. Milford Central School*, 533 U.S. 98, 106, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001).

## Limited Public Forum

■ The Supreme Court in *Perry Education Assoc. v. Perry Local Educators' Assoc.*, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983), identified three types of forums for the purpose of evaluating the constitutionality of government regulations of speech on public property: the traditional public forum, the designated public forum, and the nonpublic forum. *Id.* at 45–46, 103 S.Ct. 948. Traditional public forums, by custom, have "immemorially been held in trust for the use of the public ... for purposes of assembly, communicating thoughts between citizens and discussing public questions." *Hague v. CIO*, 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423 (1939). Examples of traditional public forums are streets and parks. *See Stewart v. District of Columbia Armory Board*, 863 F.2d 1013, 1016 (D.C.Cir.1988).

At the opposite end of the spectrum from the traditional public forum is the nonpublic forum. The nonpublic forum encompasses all public property that is not by tradition, or designation, opened for public communication. *See Perry*, 460 U.S. at 46, 103 S.Ct. 948. The government has broader discretion to limit access to nonpublic forums than to traditional public forums. For example, government restrictions on traditional public forums are subject to strict scrutiny review, and may only take the form of content-neutral time, place, and manner regulations. In nonpublic forums, however, the government may "reserve the forum for its intended purposes, communicative or otherwise," as long as the restriction is reasonable and does not discriminate based on the speaker's viewpoint. *Id.*

The intermediate category between the traditional public and nonpublic forums is the designated public forum. Designated public forums are defined as public property intentionally opened by the state "for use by the public as a place for expressive

activity." *See Perry,* 460 U.S. at 46, 103 S.Ct. 948. There are two varieties of designated public forums: limited and unlimited. *See International Society for Krishna Consciousness, Inc., et al. v. Lee,* 505 U.S. 672, 678, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992). The unlimited designated public forum, also referred to as a designated public forum, is public property that is not traditionally used for expressive activity, but has been opened to all by the state for "public discourse." *See Hopper v. City of Pasco,* 241 F.3d 1067, 1074 (9th Cir.2001). The limited public forum, however, is a narrower category of the designated public forum, and can be restricted to certain groups or to the discussion of certain topics. *See Good News,* 533 U.S. at 106, 121 S.Ct. 2093 (citing *Rosenberger v. Rector and Visitors of University of Virginia,* 515 U.S. 819, 829, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995)); *see also Perry,* 460 U.S. at 46 n. 7, 103 S.Ct. 948. As the Supreme Court explained in *Good News,* when a state establishes a limited public forum, the state is not required to open that forum to every type of speech. *Id.* at 106–107, 121 S.Ct. 2093. Both PETA and the Commission contend that the forum in this case is a limited public forum and should be evaluated as such. The Court agrees.[32]

While viewpoint discrimination is impermissible within any forum,[33] there is some dispute as to what standard of First Amendment review is applicable to content based restrictions in limited public forums. In *Perry,* the Supreme Court explained that content based restrictions in limited forums must be "narrowly drawn to effectuate a compelling state interest." *Perry,* 460 U.S. at 46, 103 S.Ct. 948. However,

the Supreme Court in *Rosenberger v. Rector and Visitors of the University of Virginia,* 515 U.S. 819, 829–30, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995), stated that content discrimination is constitutionally permissible in limited public forums "if it preserves the purposes of that limited forum."

> The State may not exclude speech where its distinction is not "reasonable in light of the purpose served by the forum," ... nor may it discriminate against speech on the basis of its viewpoint.... Thus, in determining whether the State is acting to preserve the limits of the forum it created so that the exclusion of a class of speech is legitimate, we have observed a distinction between, on one hand, content discrimination, which may be permissible if it preserves the purposes of that limited forum, and, on the other hand, viewpoint discrimination, which is presumed impermissible when directed against speech otherwise within the forum's limitations.

*Id.* Recently, the Court in *Good News Club v. Milford Central School,* 533 U.S. 98, 107, 121 S.Ct. 2093 (2001), citing *Rosenberger,* also applied the "reasonableness" standard to restrictions on limited public forums, as opposed to the strict scrutiny standard of *Perry. People for the Ethical Treatment of Animals v. Giuliani,* 105 F.Supp.2d 294 (S.D.N.Y.2000), *aff'd,* 2001 WL 1019994 (2d Cir.2001)(*"Giuliani"*), also followed *Rosenberger* in applying the reasonableness standard.

In *Giuliani,* PETA mounted a challenge to the New York City Cowparade Committee's decision to exclude PETA's design from the "CowParade." "CowParade," like the "Party Animals" exhibit,

---

**32.** As with CowParade, the Party Animals display was not open to the general public. Instead, access to this forum is restricted to either sponsors or artists whose designs are consistent with the forum's stated purposes.

**33.** *See Rosenberger v. Rector and Visitors of University of Virginia,* 515 U.S. 819, 830, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (stating that the "viewpoint discrimination ... is presumed impermissible when directed against speech otherwise within the forum's limitations.").

was a public art exhibition where sponsors decorated fiberglass cows[34] that were displayed in various areas around New York City in order to promote tourism. After the CowParade organizing committee rejected part of PETA's design as inconsistent with CowParade's Guidelines for submissions,[35] PETA challenged the CowParade Committee's decision as unconstitutional viewpoint and content discrimination in violation of the First Amendment.

Upon examining the Supreme Court's decision in *Rosenberger* and Second Circuit precedent on the distinctions between limited public forums and traditional open or nonpublic forums, the court in *Giuliani* concluded that the "reasonableness" test, not a strict scrutiny test, was the appropriate standard for content discrimination in

limited public forums. *Giuliani*, 105 F.Supp.2d at 319. Ultimately, the court determined that limited public forums were more similar in nature to nonpublic forums than traditional public forums in that the government retains and exercises "a greater measure of control over [the forum's] internal operations with respect to the property in question, as well as curtailing the rights of access to expressive activities, not of the indiscriminate public at large, but of a selected smaller portion of it." *Id.* at 310.

Since this Circuit has not addressed whether *Rosenberger* and *Good News* have changed the standard of review applied to restrictions on limited public forums,[36] this Court must choose which standard to follow. The Court, for the same reasoning set forth in *Giuliani*, believes that the

---

34. *See People for the Ethical Treatment of Animals v. Giuliani, et al.*, 105 F.Supp.2d 294, 298 (S.D.N.Y.2000) (describing Cowparade as "approximately 500 life-size fiberglass sculptures of cows in three basic poses which have been painted, decorated or otherwise altered artistically").

35. *See id.* at 301. Cowparade was intended to add to "New York City's creative, dynamic environment," as well as stimulate the economy. *Id.* at 299. In addition, the Guidelines and Approval Process for Commissioned Designs, the criteria for Cowparade submissions, specified that while the "Artist is encouraged to be creative with his or her design," he or she must also "remember that the audience will be broad-based and of all ages. Commissioned Designs that are religious, political or sexual in nature will not be accepted." 105 F.Supp.2d at 300. PETA submitted a design that divided a cow into nine sections resembling a butcher shop chart showing a cow's various cuts of meat. Each section contained a message about the health and ethical implications of eating meat. The CowParade Committee rejected part, but not all, of the design due to statements in three of the nine panels; these panels discussed cow castration, skinning cows, and a doctor's statement that sexual impotence in humans is caused by eating meat. *Id.* at 301. The Committee charged

with evaluating Cowparade submissions rejected those portions of PETA's designs in that case because it found it " 'too graphic and violent for a public display .... What troubled the committee was the provocative, graphic, offensive effect of the text chosen.' " The Committee also noted that the rejected portions were distinguished from the rest of the design, which the Cowparade Committee accepted, because it was not " 'whimsical, creative, and decorous in the manner of the majority of the other designs submitted for consideration.' " *Id.* at 301–302. In *Giuliani*, the political *content* of the message was *not* the reason for its rejection; rather, it was "the way in which parts of the message were conveyed," that is, in a violent, shocking or vulgar manner, "which caused the Committee to find the design 'inappropriate.' " *Id.* at 324.

36. The most recent D.C. Circuit opinions discussing forum analysis in light of restrictions placed on speech have not specifically addressed what standard of scrutiny is applicable in limited public forums in light of *Rosenberger* and *Good News*. *See Lederman v. United States*, 291 F.3d 36 (D.C.Cir.2002) (determining that the U.S. Capitol steps were a traditional public forum, but not addressing the scrutiny issue as applied to limited public forums); *Marlin v. District of Columbia Bd. of*

"reasonableness" standard of review applied in *Good News* and *Rosenberger* is the proper standard for evaluating restrictions on speech in limited public forums. Accordingly, the Court will apply it to evaluate the Commission's decision to display some messages, the content of which was clearly noncompliant with the stated objectives of the project, and prohibit others, such as PETA's, based on the content of its message rather than its relationship to the objectives of the project. In short, the Court must decide whether such discrimination was reasonable under the First Amendment.

### Different Treatment of Similarly Noncompliant Entrants

■ The Commission claims that it did not engage in viewpoint discrimination because it is not hostile to PETA's perspective on animal rights or circuses. Moreover, the Commission argues that its rejection of PETA's final sad circus elephant design was reasonable because the design was not an artistic expression consistent with the goals, spirit and theme of the art project, but rather a political billboard merely seeking to promote a single issue.[37] A thorough review of the Commission's treatment of PETA's prior submissions and, more importantly, its treatment of certain other entrants it accepted that were equally, or more, noncompliant with the goals and theme of the art exhibit, however, reveals a pattern of inconsistency in its treatment of similar noncompliant entrants that is inherently unreasonable, and therefore impermissible under the First Amendment.

The Commission's contention that PETA's design is not "art" is inconsistent with its own prior conduct and therefore lacking in credibility and merit. The Commission accepted PETA's "happy" circus elephant submission, which showed a smiling circus elephant wearing a headdress and a decorative blanket over its back with the word "CIRCUS" embroidered on it. Presumably, that design had sufficient artistic merit to warrant inclusion in the display. The Commission also offered to PETA as a "compromise sad circus elephant" design a modified version of PETA's sad elephant design in which it eliminated the trainer and his bull hook, but kept the tears running down its face, the shackle on its leg, and the same embroidered blanket reading "CIRCUS." The only difference between these designs and PETA's final design, which is a composite of the "happy circus elephant" design and the "compromise sad circus elephant" design, is the language embroidered on the multicolored blanket which reads, "The Circus is Coming. See: Shackles Bullhooks Loneliness All Under the 'Big Top.' "

There is no apparent, or reasonable,[38] difference in artistic merit between the happy circus elephant design, or the

---

*Elections and Ethics,* 236 F.3d 716 (D.C.Cir. 2001) (analyzing whether a polling places were traditional public or limited public forums for the purposes of evaluating whether a ban on campaign stickers in polling places was a constitutional restriction, but not addressing the specific issue of standard of scrutiny in limited public forums); *Marijuana Policy Project v. District of Columbia Bd. of Elections and Ethics,* 191 F.Supp.2d 196 (D.D.C.2002)(stating that because the restriction at issue was viewpoint discriminatory, the court need not determine what kind of forum was at issue).

**37.** Gittens 3d Decl. ¶ 3.

**38.** The reasonableness of the Commission's decision is evaluated in light of the forum's purposes and "all the surrounding circumstances." *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.,* 473 U.S. 788, 809, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). As the Supreme Court explained in *Cornelius* when determining whether the state's restriction on a nonpublic forum is reasonable, the state's decision need not be the "most reasonable or only reasonable limitation," just *a* reasonable one. *Id.* at 808, 105 S.Ct. 3439.

Commission's "compromise sad circus elephant" design, and PETA's final submission which is now before this Court. Indeed by any analysis the final submission is at least as elaborate in its artistic design of the blanket and headdress as the "compromise sad circus elephant" design the Commission offered to PETA. Since the Commission previously concluded, in effect, that the compromise and happy elephant designs sufficiently rise to the level of art acceptable for display in the Party Animals exhibit, it cannot *credibly* contend that PETA's final design is not "art," as the Commission interprets it.

Moreover, the Commission's argument that the mere presence of these words on the blanket of PETA's final design renders it a political "billboard" and not "art" is also inconsistent with the Commission's treatment of numerous entrants that had messages painted in comparable, or larger, letters on the body of the elephant or donkey it decorated.[39] Surely, if the written presentation in those cases was not a political "billboard," it cannot be credibly and fairly characterized as such in PETA's case. The Court can only conclude that the Commission's inconsistent characterization of PETA's presentation is based on the content of its message and *not* the manner of its presentation.

The Commission's remaining contention that PETA's final design is "not an artistic expression consistent with the purposes of the forum" is similarly inconsistent with its characterization and treatment of numerous other designs which it accepted. The Commission, in creating a limited public forum for the purposes of a public art display, is surely free to exercise its discretion in determining which submissions comply with the theme, spirit, and objectives of the Party Animals exhibit, but it must do so *reasonably*. While it is fair to say that the content of PETA's final submission is neither "festive," "whimsical" or likely to "foster an atmosphere of enjoyment and amusement," neither are the content of a considerable number of other entrants which were accepted, and are currently being displayed, by the Commission around the City.

For example, the Commission accepted and is displaying an elephant painted on one side with a map showing the location of the Pentagon, and on the other with a map showing the location of the World Trade Center, and carrying in its trunk a bouquet of roses and tags with the names of September 11 victims, Similarly, another design in honor of September 11 heroes bears a slogan stating "Profiles in Courage—A Tribute to Heroes," and shows portraits of a police officer, nurse, firefighter, and construction worker. In addition, the Commission accepted for display a donkey painted with portraits of civil rights leaders Frederick Douglass, Justice Thurgood Marshall, Dr. Martin Luther King, Jr., and Sojourner Truth. Quite clearly, designs portraying the September 11 attacks and offering tribute to the heroic efforts of various public servants and a design paying homage to famous civil rights leaders, no matter how deserving, cannot credibly be regarded as "festive" or "whimsical," or calculated to foster an atmosphere of "amusement", "enjoyment," or "FUN."[40] Yet, the Commission presum-

---

39. *See supra* note 5 and accompanying text.

40. The Commission has never argued, nor would it have been credible for it to do so, that the September 11 designs were "whimsical," "festive," or calculated to provide "amusement." When asked by the Court how the September 11 designs were consistent with the themes and objectives of the Party Animals forum—whimsical, festive, calculated to promote amusement—the Commission simply argued that the September 11 designs were "good piece[s] of art," and that PETA's designs "were not art" but a "political poster." The Commission never provided an explanation for how these designs were consis-

ably found these designs to be artistic expressions sufficiently consistent with the objectives of the Party Animals exhibit.

While the Court acknowledges that the Commission has discretion when evaluating submissions, the Commission cannot ignore certain fundamental criteria in accepting one or more groups of designs, and then invoke the same criteria in another case as the grounds for rejecting it. If PETA's final submission in this case had been its second sad circus elephant design (i.e., the elephant with a sign tacked to its bloody flesh), the Commission could have at least contended that the manner of its presentation (i.e., vulgar and shocking) was inconsistent with the objectives of the Party Animals exhibit; such as the Committee in New York City had done when it rejected those portions of PETA's submission in the *Giuliani* case. Here, only the message itself is arguably noncompliant with the exhibit's themes and objectives, just as the messages are in a number of other entrants that the Commission accepted. To discriminate against PETA's submission on that basis alone is inconsistent with its treatment of those other designs that are similarly noncompliant. Unfortunately for the Commission, consistency in such decisions is constitutionally significant to the determination of "reasonableness."

In *Hopper v. City of Pasco*, 241 F.3d 1067 (9th Cir.2001), the court concluded that "consistency in application is the hallmark of any policy designed to preserve the non-public status of a forum." *Id.* at 1076. In *Hopper*, the plaintiff's painting showing a nude couple was excluded from an art display in city hall for being "potentially controversial or political," as public nudity was illegal in the city. However, while the plaintiff's design in *Hopper* was excluded due to its depiction of nudity, prior exhibits in city hall had *included* works containing nudity. When determin-

ing the proper forum analysis to apply to the city hall art display, the court noted that a "policy purporting to keep a forum closed (or open to expression only on certain subjects) is no policy at all for purposes of public forum analysis if, in practice, it is not enforced or if exceptions are haphazardly permitted." *Id.*

The court in *Giuliani* recognized the importance of consistency as well, even while acknowledging that criteria for public art exhibitions necessarily provides the state with discretion to evaluate whether design submissions comply with the purposes of the exhibit. Moreover, in an art competition, any decision regarding artistic merit is inherently subjective. However, as the court in *Giuliani* explained, "absent objective criteria to guide decision makers, the measure of reasonableness ... is not so much the objective precision of the language describing the guidelines as the way state officials adhere to them, *as indicated by the government's demonstration of overall consistency,* non-discrimination and good faith, as well as by the absence of evidence that intent to regulate speech may have been the real motivation for the challenged limitation on expression." *People for the Ethical Treatment of Animals v. Giuliani, et al.,* 105 F.Supp.2d 294, 322 (S.D.N.Y.2000) (emphasis added).

Here, the Commission allowed numerous exceptions to its own criteria for some entrants, but used those very criteria to reject PETA's design. Moreover, it inconsistently characterized PETA's design as a "political billboard," and not "art" while characterizing and allowing other designs that were every bit as much "billboards" for their message to be displayed. This inconsistency runs contrary to the Supreme Court's holding in *Rosenberger,* that once a State "has opened a limited public forum ... the State must respect

tent with the purposes of the forum. July 17, 2002, Hr'g Tr. at 39, ll. 23–29; at 40, ll.1–25.

the lawful boundaries it has itself set." *Rosenberger v. Rector and Visitors of the Univ. of Virginia,* 515 U.S. 819, 829, 115 S.Ct. 2510 (1995). The Commission's conduct shows that it did not respect the boundaries of the forum it established. Once the Commission decided to allow messages noncompliant with its stated themes and objectives, it could not reasonably reject other noncompliant messages *unless* it could convincingly demonstrate that its rejection, like in *Giuliani,* was based upon the manner of its presentation and *not* the controversial nature of its message. Stated simply, inconsistent treatment of messages which are similarly noncompliant with the stated themes and objectives of the limited public forum is inherently unreasonable and unacceptable discrimination under the First Amendment, regardless of whether the Commission believes it is not viewpoint related.[41]

## PRELIMINARY INJUNCTION

Since the Court has determined that PETA has successfully demonstrated the merits of its claim, the Court necessarily determines that PETA has satisfied the test for a preliminary injunction under *CityFed Financial Corp. v. Office of Thrift Supervision,* 58 F.3d 738, 746 (D.C.Cir. 1995).

Moreover, since the Supreme Court in *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), stated that "the loss of First Amendment freedoms, for even minimal periods of time, unques-

tionably constitutes irreparable injury" where the injury is "both threatened and occurring" at the time of plaintiff's motion for a preliminary injunction. *Id.* at 374, 96 S.Ct. 2673. *Accord, National Treasury Employees Union v. United States,* 927 F.2d 1253, 1254 (D.C.Cir.1991), *Wagner v. Taylor,* 836 F.2d 566, 576 n. 76 (D.C.Cir. 1987). The Court finds in the instant action that PETA's injury is both "threatened and occurring," as the Party Animals exhibit was under way when PETA made its motion for a preliminary injunction, and the exhibit will continue until September. In addition, the Court agrees with the plaintiff that the public interest favors a preliminary injunction whenever First Amendment rights have been violated.

Finally, the Court does not find that PETA's participation in Party Animals exhibit will substantially injure the defendants. No extraordinary effort or cost will be necessary to make arrangements for PETA's entrant to be displayed in a prominent location consistent with the terms of the sponsorship level to which it subscribed. Moreover, the Commission will not only keep PETA's $5,000 contribution, but will receive the proceeds, if any, from the auction of PETA's Party Animal.[42] These proceeds will then be used to promote arts education and organizations— the very reason Commission organized Party Animals in the first place.

For the reasons set forth above, the Court grants the plaintiff's Motion for a Preliminary Injunction and orders the

---

**41.** PETA argues that the motivation behind the Commission's inconsistent treatment of these similarly noncompliant entrants is its desire to prohibit a message it views as too controversial for the exhibit. While the Court does not need to determine whether that was, in fact, the motive behind the Commission's decision, it would note that if it were, it would be, per se, viewpoint discrimination and violative of the First Amendment. *See Hopper v. City of Pasco,* 241 F.3d 1067, 1079 (stating

that the city's policy or practice of banning controversial art "may all too easily lend itself to viewpoint discrimination").

**42.** *See* Pl.'s Mem. Supp. Prelim. Inj. Ex., "Party Animals Call to Artists" materials (explaining that at the conclusion of the Party Animals exhibit, a "Raucous Caucus Auction" will take place, "and all proceeds will be channeled back to the D.C. Arts Commission Grant Programs").

Commission to display PETA's July 2, 2002, design in a prominent location in the City, consistent with the terms of the sponsorship level to which PETA subscribed, for the duration of the Party Animals exhibit.

### ORDER

Upon consideration of the plaintiff's motion for preliminary injunction, and the defendant's opposition thereto, and of the declarations, exhibits, and legal memoranda filed in support thereof and in opposition thereto, and of the arguments of counsel, and of the entire record in this action:

It appearing to the Court that plaintiff is likely to succeed on the merits of its action, that it will suffer irreparable injury if relief is not provided, that the defendants will not be harmed if relief is issued, and that the public interest favors the entry of relief, it is therefore

ORDERED that plaintiff's Motion for Preliminary Injunction is GRANTED; and it is further

ORDERED that defendants display PETA's July 2, 2002, design in a prominent location in the District of Columbia, consistent with the terms of the sponsorship level to which PETA subscribed, for the duration of the Party Animals display.