# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

Argued September 10, 2004           Decided July 5, 2005

No. 03-7195

PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC.,
APPELLEE

v.

ANTHONY GITTENS,
EXECUTIVE DIRECTOR, DISTRICT OF COLUMBIA COMMISSION
ON THE
ARTS AND HUMANITIES, AND DISTRICT OF COLUMBIA,
APPELLANTS

---

Appeal from the United States District Court
for the District of Columbia
(02-cv00984)

---

*Donna M. Murasky*, Senior Litigation Counsel, Office of
the Attorney General for the District of Columbia, argued the
cause for appellants. With her on the briefs were *Robert J.
Spagnoletti*, Attorney General, and *Edward E. Schwab*, Deputy
Attorney General.

*Arthur B. Spitzer* argued the cause for appellee. With him
on the brief was *Fritz Mulhauser*.

Before: GINSBURG, *Chief Judge*; RANDOLPH and ROGERS,
*Circuit Judges.*

Opinion for the Court filed by *Circuit Judge* RANDOLPH.

Concurring opinion filed by *Circuit Judge* ROGERS.

RANDOLPH, *Circuit Judge*: We remanded the record because it was uncertain whether the First Amendment issue in this case was moot. 396 F.3d 416 (D.C. Cir. 2005). On remand, the district court ruled that its $4,000 award to the People for the Ethical Treatment of Animals, Inc. -- PETA -- represented damages for the District of Columbia's violation of PETA's First Amendment rights. The damage award saves the constitutional issue from mootness. *See, e.g.*, *Powell v. McCormack*, 395 U.S. 486, 497-98 (1969). We will therefore proceed to the merits.

I.

The following recitation of facts is drawn from our earlier opinion. In the fall of 2001, the District's Commission on the Arts and Humanities issued a "Call to Artists" for "Party Animals," a program intended to showcase local artists, attract tourists and enliven the streets "with creative, humorous art." "Party Animals" would be the "largest public art project in the history of the District of Columbia." It would consist of pre-formed sculptures of 100 donkeys and 100 elephants, four and one-half feet tall and five feet long, installed at prominent city, federal and private locations. The Commission invited artists to submit designs for painting and decorating the models. If the Commission's selection committee approved the design, the artist would receive a $1,000 honorarium and $200 for materials and supplies. The Commission retained ownership of the decorated donkeys and elephants and planned to sell them at auction after the exhibit ended.

The written announcement stated that "Party Animals" would showcase the "whimsical and imaginative side of the Nation's Capital" and that the Commission was looking "for artwork that is dynamic and invites discovery," "original and creative," "durable" and "safe." The Commission would not "allow direct advertising of any product, service, a company name, or social disrespect," and would impose "restrictions against slogans and inappropriate images." All designs were "subject to the Selection Committee's decision." More than 1,000 artists entered designs, most of which the Selection Committee rejected.

The Arts Commission also announced that it would accept designs outside of the general artistic competition from individuals or organizations who paid $5,000 or more to be high-level sponsors of the program. These sponsors could choose their own artist to decorate a donkey or elephant, which would be placed in a "prime public location." The written announcement also stated that the Arts Commission "reserves the right of design approval" and would own the decorated donkey or elephant.

On the base of each sculpture there would be a plaque with the artist's name and the following statement:

DC Commission on the Arts & Humanities
Anthony A. Williams, Mayor
www.partyanimalsdc.org

An organization contributing $2,000 or more also was entitled to have its name on the plaque.

In mid-March 2002, PETA submitted a sponsorship package, a check for $5,000, and a sketch of its proposed design, drawn by a cartoonist. PETA describes itself as a nonprofit

corporation, founded in 1980, to support "the principle that animals are not ours to eat, wear, experiment on, or use for entertainment." Brief of Appellee at 5. The sketch PETA submitted depicted an elephant with a sign tacked to its side stating:

> The CIRCUS is Coming
> See: Torture
> Starvation
> Humiliation
> All Under the Big Top

A selection committee member informed PETA that its design was unacceptable. A few days later, PETA submitted two new designs, one of a happy circus elephant, the other of a sad, shackled circus elephant with a trainer poking a sharp stick at him. The committee member called PETA's representative to say that the Commission had accepted the happy elephant, but rejected the sad one. PETA then submitted a fifth design, depicting a shackled elephant crying. A sign tacked to the elephant's side read: "The Circus is coming. See SHACKLES - BULL HOOKS - LONELINESS. All under the 'Big Top.'" The Commission rejected this design. According to an affidavit of its executive director, PETA's proposal was "a political billboard, not art, and unlike any other design submission, it sought merely to promote a single issue and was not an artistic expression consistent with the goals, spirit and theme of the art project. The Party Animals arts project was designed to be festive and whimsical, reach a broad based general audience and foster an atmosphere of enjoyment and amusement. PETA's proposed fifth design did not complement these goals, and indeed was contrary to the Party Animals' expressive, economic, aesthetic, and civic purpose."

The Party Animals exhibit opened at the end of April 2002. One month later, PETA filed an action against the executive director of the Arts Commission and the District of Columbia, seeking a preliminary and permanent injunction and damages. While the case was pending, PETA submitted a sixth design to the Commission, slightly altering its fifth design. Again the Commission rejected it, for reasons similar to those given for rejecting PETA's previous submission. All the while, the Commission held PETA's $5,000 check without cashing it.

After proceedings unnecessary to recount, the district court issued a preliminary injunction, finding that the Commission had violated PETA's freedom of speech and requiring the Commission to display PETA's final elephant. *People for the Ethical Treatment of Animals v. Gittens*, 215 F. Supp. 2d 120 (D.D.C. 2002). PETA had its elephant installed at Connecticut Avenue and Q Street, N.W. It remained there from the end of August until the end of September 2002, when "Party Animals" closed. In November 2003, the court issued a memorandum opinion and order granting PETA's motion for summary judgment, denying the District's cross-motion, and ordering the Commission to "refund" $4,000 of the $5,000 PETA had paid because PETA's elephant had been "excluded from the public eye" for four of the exhibit's five months. In late December 2003, the Clerk of the court entered the judgment.

The District noted an appeal from the order granting the preliminary injunction (No. 02-7106), from the November 2003 memorandum and order granting summary judgment (No. 03-7190), and from the December 2003 judgment for $4,000 (No. 03-7195). We dismissed the first two appeals in our earlier decision. 396 F.3d at 425. Only the December 2003 judgment is before us.

6

II.

Donkeys and elephants are the symbols of the two major political parties. Restricting the "Party Animals" exhibit to only these symbols excluded the symbols of all other political parties. But there is no claim that the Commission thereby violated the First Amendment. *See, e.g., City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410 (1993). Nor is there any claim that the Commission's written design criteria -- no advertising, no "social disrespect," no "slogans and inappropriate images" -- were unconstitutional on their face.

As PETA sees the case, the Commission "would have had a leg to stand on in rejecting PETA's design" if it had accepted "only whimsical or lighthearted designs" and had rejected "all designs with political or social messages . . .." Brief of Appellee at 31. But PETA claims the Commission did not do so. Instead, it approved "numerous designs that were not whimsical," such as tributes to heroes and victims of the September 11 terrorist attacks and designs commemorating civil rights leaders. *Id.* at 30. And the Commission approved designs "with political or social messages or slogans," such as designs incorporating the "butterfly ballot" used in Palm Beach County, Florida in the 2000 presidential election and a design containing quotations from politicians or about politics. *Id.* at 11-12, 30. PETA's argument -- with which the district court agreed -- is that the Commission modified its design criteria in practice and that "Party Animals" was a "limited public forum," at least for those who donated $5,000 or more. *Id.* at 34, citing *inter alia Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819 (1995); and *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384 (1993). Because each of PETA's "proposed designs satisfied the Party Animals 'design criteria,' as published and as applied by the Commission," the Commission engaged in viewpoint or content discrimination, in

violation of the First Amendment, when it rejected those designs.

The District, of course, disagrees. It argues that as a patron of the arts, the Commission had discretion "to select those messages that it wants to promote without running afoul of the First Amendment." Brief for Anthony Gittens, *et al.* at 23, citing *inter alia National Endowment for the Arts v. Finley*, 524 U.S. 569 (1998); *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666 (1998); and *Rust v. Sullivan*, 500 U.S. 173 (1991); *see also United States v. Am. Library Ass'n*, 539 U.S. 194 (2003) (plurality opinion). The District also attempts to distinguish PETA's examples of non-whimsical designs from the designs, which it approved, containing slogans or political messages in order to show that the Commission reasonably rejected PETA's submissions as inconsistent with the goals and spirit of the art project. Brief for Anthony Gittens, *et al.* at 32-34.

Although the District invokes some of the Supreme Court's "government speech" cases, the latest of which is *Johanns v. Livestock Marketing Ass'n*, 125 S. Ct. 2055 (2005), it is not clear which speech it has in mind. We think it important to identify precisely what, if anything, constituted speech of the government. As to the message any elephant or donkey conveyed, this was no more the government's speech than are the thoughts contained in the books of a city's library. It is of no moment that the library owns the books, just as the District of Columbia owned the donkeys and elephants. Those who check out a Tolstoy or Dickens novel would not suppose that they will be reading a government message. But in the case of a public library, as in the case of the Party Animals exhibit, there is still government speech. With respect to the public library, the government speaks through its selection of which books to put on the shelves and which books to exclude. In the case before

us, the Commission spoke when it determined which elephant and donkey models to include in the exhibition and which not to include. In using its "editorial discretion in the selection and presentation of" the elephants and donkeys, the Commission thus "engage[d] in speech activity"; "compilation of the speech of third parties" is a communicative act. *Forbes*, 523 U.S. at 674.

This takes us part of the way toward resolving this case. The First Amendment's Free Speech Clause does not limit the government as speaker, *see Rosenberger*, 515 U.S. at 833, although other constitutional constraints not at issue here, such as the Equal Protection Clause, might. The curator of a state-owned museum, for example, may decide to display only busts of Union Army generals of the Civil War, or the curator may decide to exhibit only busts of Confederate generals. The First Amendment has nothing to do with such choices.

PETA argues here, as it did in the district court, that we should treat the sponsorship portion of the "Party Animals" program as a "designated" public forum, a forum in which government can limit the subject of the program but cannot, consistent with the First Amendment, discriminate on the basis of viewpoint. *See, e.g., Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.,* 473 U.S. 788, 802 (1985). We believe that public forum principles "are out of place in the context of this case." *Am. Library Ass'n*, 539 U.S. at 205 (plurality opinion). The situation here is far removed from one in which, for instance, a private organization is planning a parade and the permitting authorities restrict the points of view the organization may express. Then the government would be performing the role of regulating private speech. To illustrate further, the authorities in charge of a city park must make content-neutral and viewpoint-neutral decisions when passing on applications for demonstrations in the park. *See, e.g., Clark v. Community*

*for Creative Non-Violence*, 468 U.S. 288 (1984). But those First Amendment constraints do not apply when the same authorities engage in government speech by installing sculptures in the park. If the authorities place a statue of Ulysses S. Grant in the park, the First Amendment does not require them also to install a statue of Robert E. Lee.

In many instances it is quite clear that the government is not regulating private speech. The government may produce films and publications. It may run museums, libraries, television and radio stations, primary and secondary schools, and universities. In all such activities, the government engages in the type of viewpoint discrimination that would be unconstitutional if it were acting as a regulator of private speech. *See* Frederick Schauer, *Principles, Institutions, and the First Amendment*, 112 HARV. L. REV. 84, 104-05 (1998). As Professor Schauer forcefully argues, the First Amendment problems posed by similar kinds of government activity cannot be solved by applying public forum analysis. *Id.* at 99. Public forums and designated public forums give private speakers an easement to use public property. Nothing of the sort occurred here. Instead, the question we face is whether the "Party Animals" program, or at least the sponsorship portion of it, was "one of the government enterprises which may control for content or viewpoint, and as to this question public forum doctrine offers no assistance." *Id.*

Four Justices in *American Library Ass'n* agreed with Professor Schauer's reasoning, as did Justice Breyer in his concurring opinion, 539 U.S. at 215-16, which makes a majority, although Justice Breyer would have applied strict scrutiny in that case. The issue in *American Library Ass'n* was whether Congress could condition funding to libraries on their implementation of internet filter software. Writing for a plurality, Chief Justice Rehnquist stated that "forum analysis

and heightened judicial scrutiny are incompatible" with the government's role as patron of the arts, television broadcaster, and librarian. *Id.* at 204-05. *Arkansas Educational Television Commission v. Forbes*, 523 U.S. 666, and *National Endowment for the Arts v. Finley*, 524 U.S. 569, had suggested as much. As a television broadcaster, the government must "exercise . . . journalistic discretion," *Forbes*, 523 U.S. at 674; as an arts patron, the government must "make esthetic judgments," *Finley*, 524 U.S. at 586; and as a librarian, the government must "have broad discretion to decide what material to provide to [its] patrons." *Am. Library Ass'n*, 539 U.S. at 204 (plurality opinion).

The same is true here. Consider two analogies. First, suppose that instead of placing the elephants and donkeys on sidewalks and in parks, the Commission placed them in one of the District's public buildings. There could be no persuasive argument that the First Amendment would prohibit the Commission from engaging in viewpoint discrimination when it decided which designs to accept and which to reject. The hypothetical is indistinguishable from a government art museum and from this case. It should make no constitutional difference that "Party Animals" was an outdoor art exhibit or that some of the donkeys and elephants were placed on private property.

Second, suppose that the Commission put on a parade of elephants and donkey floats, making the same design decisions as it did here. Once again we can see no First Amendment problem with the Commission making arbitrary or viewpoint-based decisions about which donkeys and elephants it wanted in its parade. No one could plausibly argue that an Inauguration Parade has to have balance, or that the losing Presidential candidate must -- if he requests -- be allowed to have a float of his own. *See Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 568-70 (1995).

As against this, PETA argues its First Amendment rights were violated because the sponsorship portion of the "Party Animals" program, as distinguished from the "Call to Artists" portion, required those participating to pay the Commission $5,000. It is true that anyone who paid this amount had greater privileges than those who engaged in the general competition: sponsors had more design leeway, they could select their own artists and, if their designs were accepted, they would have their donkey or elephant displayed for five months in a prominent location with a plaque bearing their name. While the Commission's failure to abide by any of these commitments might give rise to a contract claim, we cannot see how any of this matters under the First Amendment. If the head of the government's National Gallery of Art solicited corporate sponsorship to defray the costs of an exhibition, this would hardly transform the National Gallery into a limited public forum. We think the same would be true if the National Gallery gave the sponsor some role in selecting which works of art the museum would exhibit and the curator rejected the sponsor's choice, for subjective and arbitrary reasons. "[E]sthetic judgments," *Finley*, 524 U.S. at 586, often may appear to be arbitrary, and sometimes are.

Much of PETA's argument revolves around what degree of control the Commission retained over the designs sponsors submitted. The literature sent to potential sponsors included the statement that the Commission "reserves the right of design approval." PETA believes this statement means nothing more than that the Commission "reserved the right to enforce its established criteria, and not a right to act with utter arbitrariness." Brief of Appellee at 29. But PETA offered no evidence that this is what the Commission had in mind when it reserved the right to reject designs. The declaration from the Commission's Executive Director, on which PETA relied, stated something quite different. According to the declaration, the

Commission retained discretion to reject designs that in the Commission's view "conveyed controversial messages," which is consistent with the Commission's written announcement that it would impose restrictions against what it considered to be "inappropriate images." The Commission rejected PETA's designs on that ground (and on the ground that they were not art). Apart from the evidentiary point, PETA's contention founders on the legal principle that the Commission, in deciding which designs to accept or reject -- that is, in using its "editorial discretion in the selection and presentation of" the various designs -- "engage[d] in speech activity." *Forbes*, 523 U.S. at 674. As we noted before, "compilation of the speech of third parties" is a communicative act. *Id.* As a speaker, and as a patron of the arts, the government is free to communicate some viewpoints while disfavoring others, even if it is engaging -- to use PETA's words -- in "utter arbitrariness" in choosing which side to defend and which side to renounce. The First Amendment's Free Speech Clause does not apply to the government as communicator, and it did not restrict the Commission in its decisions about PETA's elephants.

*Reversed.*

ROGERS, *Circuit Judge,* concurring: Without adopting the court's statement on mootness, Op. at 2, *see PETA v. Gittens*, 396 F.3d 416, 426-27 (D.C. Cir. 2005) (Rogers, J., concurring in part and dissenting in part), I concur in the holding that the Commission did not violate PETA's First Amendment rights.