# United States Court of Appeals
## For the First Circuit

No. 08-2587

THOMAS SUTLIFFE; DONALD SISSON; LEO GRIMARD; NANCY LEE GRIMARD; RENEE VICTORIA; EPPING RESIDENTS FOR PRINCIPLED GOVERNMENT, INC.,

Plaintiffs, Appellants,

v.

EPPING SCHOOL DISTRICT; TOWN OF EPPING; BARBARA D. MUNSEY, Superintendent of Schools, Administrative Unit #14; HAROLD K. LAPIERRE, Moderator, Town of Epping School District; SUSAN MCGEOUGH, Member, Town of Epping Board of Selectmen; THOMAS GAUTHIER, Member, Town of Epping Board of Selectmen; CHRISTOPHER MURPHY, Member, Town of Epping Board of Selectmen; KIM SULLIVAN, Member, Town of Epping Board of Selectmen; MARCI MORRIS, Chair, Epping School Board; JEFFREY NOLLETT, Member, Epping School Board; SUSAN KIMBALL, Member and Chair, Epping School Board; PAMELA TIBBETTS, Member and Chair, Epping School Board; SCOTT BOOTH, Member, Epping School Board; ROBERT LONEK, Member, Epping School Board; JEFFREY LEDUC, Member, Epping School Board; MARK A. VALLONE, Principal, Epping Elementary School,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Joseph N. Laplante, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Ebel,* Circuit Judges.

---

*    Of the Tenth Circuit, sitting by designation.

Benjamin T. King with whom Charles G. Douglas, III and Douglas, Leonard & Garvey, P.C. were on brief for appellants.

John T. Alexander with whom Daniel J. Mullen and Ransmeier & Spellman Professional Corporation were on brief for Town appellees.

Diane M. Gorrow with whom Soule, Leslie, Kidder, Sayward & Loughman, P.L.L.C. was on brief for school appellees.

———————————

September 17, 2009

———————————

**LYNCH**, **Chief Judge**.  This unusual First Amendment case grows out of a dispute over access to government channels of written and electronic communication to conduct an ongoing debate over government spending in the Town of Epping, New Hampshire.

A citizens group that advocates reduced spending, Epping Residents for Principled Government ("ERPG"), along with its chairman Thomas Sutliffe and another member, in 2006 brought this suit under 42 U.S.C. § 1983 against various Town and school official defendants.[1]  The complaint was later amended in 2007 to add as plaintiffs three other Town residents who were unaffiliated with ERPG.  Plaintiffs claimed that defendants violated their First and Fourteenth Amendment rights when defendant Town and school officials advocated for approval of budgets and spending on school and Town purposes through school and Town newsletters, mailings, and other forms of communication including the Town website, while denying plaintiffs access to these same communication channels to express their opposing views.

The district court, in 2008, dismissed the claims of the three added plaintiffs for lack of standing.  Sutliffe v. Epping Sch. Dist. (Sutliffe III), No. 06-cv-474, ___ F. Supp. 2d ___, 2008

---

[1]  These included the Town and its Board of Selectmen (collectively the "Town defendants"), as well as the Epping School District, its superintendent, the school district moderator, the principal of Epping Elementary School, and current and former members of the Epping School Board (collectively the "school defendants").

-3-

WL 939183, at *6-7 (D.N.H. Apr. 4, 2008).  It also dismissed the bulk of the original plaintiffs' claims on res judicata and collateral estoppel grounds, in light of a similar suit that plaintiffs had previously brought -- and lost -- in state court. Id. at *5-13.  In a separate order later that year, the district court granted summary judgment to defendants on plaintiffs' remaining claims, concerning the Town website.  Sutliffe v. Town of Epping (Sutliffe IV), No. 06-cv-474, 2008 WL 4922348 (D.N.H. Nov. 13, 2008).  We now affirm the rulings in both orders.

I.

ERPG, which describes itself as "a perennial thorn in [the Town's] side," has been engaged in a longstanding effort to curb what it sees as "profligate spending" by the Town and its school district.

As part of this effort, on January 31, 2005, in the lead-up to the March 8, 2005, local elections, ERPG's chairman, Sutliffe, sent a letter to the Epping School Board, accusing the school board of using public resources to engage in one-sided advocacy in certain unspecified mailers sent prior to the previous year's election.  The letter also cited the Epping Elementary School newsletter, Cool News, which it claimed gave an unfair voice to a private organization called the Epping Advocates; the newsletter listed the address for the Advocates' website, which promoted a certain view (allegedly favorable to that of the school

-4-

board) on the issues and candidates presented in the 2004 election. ERPG's letter demanded that the school board afford a similar opportunity to "those residents who hold a different point of view on matters advocated by your Board" and that all such materials distributed in the future, particularly with regard to the March 2005 election and future elections, "include both sides of [the] issue."

Sutliffe had sent a similar letter on behalf of ERPG on January 29, 2005, to the Town's Board of Selectmen. The letter accused the selectmen of producing and distributing, using public funds, a "flyer which . . . advocated the passage of certain warrant articles" before the previous election. As with the school board, the letter demanded that the Board of Selectmen provide ERPG with an opportunity to express its opposing opinion in any future materials from the selectmen, specifically those relating to the upcoming March 2005 election. Neither the school board nor the selectmen acceded to ERPG's demands.

A.      The New Hampshire State Court Litigation

In response, on March 3, 2005, just days before the election, Sutliffe and ERPG filed a pro se, ex parte petition for injunctive and declaratory relief against both boards and their respective chairpersons (collectively the "state court defendants") in the Rockingham County Superior Court. The petition sought to enjoin the school board from sending any further mailings on issues

pertaining to the election "without allowance for inclusion of a differing viewpoint" and to grant ERPG a "rebuttal mailing to be sent to all Epping residents prior to the March 8, 2005 election, at the School District's expense."  It also requested that the court require the selectmen, before the March 8 election, to send an addendum to the 2004 annual report[2] with ERPG's views, again at the Town's expense.  Failing this, the petition asked the court to delay the election.

The petition asserted that the state court defendants had violated the New Hampshire Constitution and the First and Fourteenth Amendments of the U.S. Constitution by "expend[ing] public monies for purposes of promoting or advocating a particular position on an election measure or issue."  In support of this claim, ERPG's petition cited the 2004 annual report, which included sections written by both the school board and the selectmen.  ERPG claimed that both sections contained advocacy in favor of the passage of certain warrant articles that were up for consideration in 2004.  ERPG pointed to two statements in the section prepared by the school board's chairperson:  (1) "We ask for your support of the three year paraprofessional contract and the warrant article general maintenance items."  And (2) on another warrant article, "As always, your affirmative vote on the school budget is vitally

_____

[2]    The selectmen and the school board produce an annual report, which includes budget details, meeting minutes, and other information from committees, auditors, and department heads.

-6-

important.  This appropriation is the money needed to effectively run our schools on a day to day basis."  ERPG also objected to material in the selectmen's portion, which contained a report by the police chief on another warrant article that stated:

> I am not convinced that we can accomplish the mission of this department with the current staffing and ask the town to support our needs as we take on additional duties each year. Your support is vital and I am asking you again this year to vote favorably for the addition to our police force.

Plaintiffs' objections went beyond the 2004 annual report.  The petition also cited Sutliffe's January 29 and 31 letters.  It alleged that, in spite of its requests, the school board sent three mailings in the month that followed, along with numerous flyers sent home with students, all without giving ERPG a chance to express its viewpoint.  The petition did not explicitly reference the Cool News newsletter or any other specific materials.

The superior court rejected plaintiffs' request for ex parte relief on March 3, 2005, the same day the petition was filed.  Realizing that they would be unable to attain relief before the March 8 election, the plaintiffs filed a motion to amend the petition on March 4.  In place of the relief requested in the ex parte petition, the amended petition requested that the court: (1) find that the 2003 and 2004 annual reports contained unwarranted advocacy and thus constituted invalid expenditures of public funds; (2) enjoin "all Epping public officials in the future from their

continued use of unwarranted advocacy," as required by the New Hampshire and U.S. Constitutions; and (3) order that the 2005 and 2006 annual reports contain a statement advising citizens on the impermissibility of advocacy with the use of public funds.

On June 1, 2005, the superior court conducted a bench trial on the relief requested in the amended petition. At the trial, the plaintiffs submitted a packet of materials labeled as Exhibit 1. These materials included copies of the Cool News school newsletter from February and March 2004; school mailers from March 9, 2004, and March 8, 2005; photographs showing blueprints and a model of a proposed school addition which had been placed at the polls in the March 8, 2005 election; statements detailing the cost of mailing certain school flyers in 2004; and a March 1, 1996, memorandum to the Epping School District prepared by its attorney regarding the use of public funds for advocacy.[3]

The superior court admitted these exhibits into evidence, but stated that it would limit its review to the Town and school board statements to which the plaintiffs had referred in their

_____

[3] The memorandum was prepared in response to a letter sent in 1996 to various school districts, including the Epping School District, on behalf of the Granite State Taxpayers Association. The Association's letter apparently asserted that it was illegal for the school boards to comment on an upcoming state senate bill. The memorandum, in response, recommended that school district refrain from expending public funds on "campaign material" but added that it was not impermissible for school boards to make recommendations regarding warrant articles or use public funds to educate the public about an election issue or for elected officials to express their views on issues confronting their community.

petition.[4]  Plaintiffs explained that the materials were intended "to give . . . some background basically on what transpired because this all started in the year 2004."  The evidence illustrated how the plaintiffs "were denied . . . from all angles[,] from the selectmen, the school committee, from any other planning board or conservation commission."  The court again clarified that it would only "address the denials that are contained in [the] petition," and the plaintiffs agreed to this limitation.

On June 15, 2005, the superior court issued a decision denying plaintiffs' request for declaratory judgment and injunctive relief.  It ruled that the statements in the 2004 annual report "were made by elected public officials speaking on behalf of their respective public entities" and "in furtherance of a public purpose."  Epping Residents for Principled Gov't, Inc. v. Epping Sch. Bd. (Sutliffe I), No. 05-E-0094, slip op. at 3 (N.H. Super. Ct. June 15, 2005).  Thus, the statements cited in the plaintiffs' petition did not violate the New Hampshire Constitution.  Id.  The court also concluded that the statements did not violate the First and Fourteenth Amendments because the "United States Supreme Court

---

[4]    At the hearing, in response to the plaintiffs' submission of the materials in Exhibit 1, the court told the plaintiffs:
    You have submitted a great deal of material. . . . I just can't have a declaratory judgment that is open-ended [such that] every time someone sends out a letter, I have to decide [whether it is legal].  In other words, the only thing I am going to decide is whether the material referenced in your original petition is legal . . . to send [out].

has made it clear that the government may use public funds to endorse its own measures." Sutliffe I, slip op. at 4-5 (citing Johanns v. Livestock Mktg. Ass'n, 544 U.S. 550, 553 (2005)).

Plaintiffs filed a motion to reconsider, which was denied by the superior court on July 19, 2005. The motion to reconsider asserted that the superior court's June 15 decision contained various legal and factual errors. It did not assert, however, that the superior court had erred in limiting its review to the statements in the 2004 annual report.[5]

The plaintiffs appealed, and on October 6, 2006, the New Hampshire Supreme Court affirmed the superior court's decision denying declaratory judgment and injunctive relief. On appeal, plaintiffs had urged the court to rule on "numerous statements by the [school board and selectmen] upon which the trial court did not rule," including the 2004 Cool News newsletter, the school mailers, and the election photographs. Epping Residents for Principled Government, Inc. v. Epping Sch. Bd. (Sutliffe II), No. 2005-0600, slip op. at 3 (N.H. Oct. 6, 2006) (mem.). In accordance with longstanding principles of New Hampshire law, the court "decline[d] to address the [plaintiffs'] assertions concerning any alleged

---

[5] Plaintiffs did not argue to the superior court that it should have considered additional claims arising from the materials in Exhibit 1, such as the Cool News newsletter, the school mailers, or the events that transpired during the March 8 election, nor did they at any point seek to amend their petition to encompass such additional claims.

statement by the [state court defendants] other than those specifically addressed by the trial court." Id. If the plaintiffs believed the superior court erred in confining its review, their recourse under state law was to raise this argument before that court in a motion for reconsideration; they failed to do so, however, and they could not raise the issue for the first time on appeal. Their pro se status did not relieve them of their responsibility to comply with procedural rules. Id. at 3-4 (citing N.H. Dep't of Corr. v. Butland, 797 A.2d 860, 862 (N.H. 2002)). Finally, the court upheld the superior court's ruling that plaintiffs were not entitled to declaratory or injunctive relief on the basis of the statements in the 2004 annual report, noting that plaintiffs conceded at oral argument that these statements were lawful. Id. at 4.

B.       The Federal Court Litigation

Two months later, on December 18, 2006, plaintiffs, now represented by counsel, filed this suit in federal court. The suit alleged that defendants violated plaintiffs' First and Fourteenth Amendment rights by "creating fora . . . for the expression of their viewpoints regarding spending, while failing and refusing to allow the [plaintiffs] access to such fora in order to communicate their contrary viewpoints regarding spending." Along with Sutliffe and ERPG, who were the plaintiffs in the state court action, the complaint listed as a plaintiff Donald Sisson, an Epping resident

and ERPG member. Along with the school board and the Board of Selectmen, the federal complaint also named a wider set of defendants, including the Town, the Epping School District, its superintendent, the school district moderator, and the principal of Epping Elementary School.

The initial complaint sought only money damages and was based on "activities occurring in 2004 and 2005." These events were: (1) the distribution of the Cool News newsletter in February and March 2004 (which included the reference to the Advocates' website; (2) the distribution of other "promotional flyers" by the school in 2004 and 2005, which were mailed at the taxpayers' expense; (3) the use of similar "advocacy mailers" since 2001; (4) the placing of favorable information about a proposed school addition at the polls during the March 8, 2005, election; (5) mailings from the Board of Selectmen advocating the passage of certain warrant articles in 2004; and (6) mailings from the Town conservation committee advocating particular political viewpoints in the 2003 and 2004 elections.

The school and Town defendants filed motions to dismiss, arguing that plaintiffs' claims were barred by res judicata and the Rooker-Feldman doctrine. Before the district court ruled on these motions, plaintiffs moved to amend their complaint. The plaintiffs' motion to amend was granted on May 3, 2007. The first amended complaint, filed the same day, differed from the initial

complaint in two ways.  First, in an apparent attempt to circumvent defendants' res judicata argument, the amended complaint added three plaintiffs, Leo Grimard, Nancy Grimard, and Renee Victoria, all Epping residents who had no affiliation with ERPG.  Second, the first amended complaint added an allegation based on alleged advocacy in the 2006 annual report, which the plaintiffs explained is "a matter that [they] could not possibly have raised" in the 2005 state court trial.

Defendants moved again to dismiss, and on October 12, 2007, plaintiffs filed a second amended complaint.  The second amended complaint added a new set of allegations based on the Town's decision in 2007 to add a link on its website to the website for the Speak Up, Epping! (SUE) event while refusing to add a link to ERPG's website.  The facts surrounding these allegations are briefly summarized.

Since the 1990s, the Town has owned and maintained a website; the Board of Selectmen determines what materials are placed on it.  The website provides information on various Town boards and commissions, Town meetings, and proposed warrant articles.

The Town website has also included hyperlinks to other websites.  It is undisputed that these hyperlinks have only been added with the approval of the Board of Selectmen. Over the years, the Board of Selectmen has granted approval for external links to

-13-

the websites of "governmental agencies and certain civic organizations," such as the New Hampshire Municipal Association, the Epping Middle High School, and the Exeter Area Chamber of Commerce. These links are not the subject of plaintiffs' complaint.

For many years, there was an informal and unwritten policy as to when links would be added. Defendants say the purpose of the hyperlinks on the Town's website was always to "provide information to the citizenry of the Town on Town business." The only links that were permitted were ones that "would promote providing information about the Town," and any links that were "political or advocate[d] for certain candidates" were not allowed. However, on March 31, 2008, after the events at issue in this suit occurred, the Town adopted a written website policy that limited hyperlinks on the Town website to those for governmental agencies or "events and programs that are coordinated and/or sponsored by the Town of Epping."

In early 2007, the Town placed a hyperlink on its website to the website for SUE, which was an event that was scheduled to take place on April 14 of that year. SUE, which was part of a state-wide program facilitated by the University of New Hampshire Cooperative Extension, consisted of a day-long discussion, held at the Epping Middle-High School, among Town residents; the event was intended to foster community spirit, civic discourse, and the

-14-

organization of community-defined projects and action groups. SUE was not itself a formal organization.

Epping's Board of Selectmen endorsed the SUE event. In August 2006, at the behest of a group of Epping residents who had formed a steering committee for SUE, the selectmen agreed to provide $500 in funds to the University of New Hampshire Cooperative Extension to cover the costs of facilitating the event. The Board of Selectmen entered into a memorandum of understanding with the Extension regarding the details of the event and later received reports from the steering committee as planning and preparation for the event progressed. The steering committee provided the selectmen detailed information on its members, meeting times, purpose, and finances. One of the reports from the steering committee to the selectmen also explained plans for getting the word out about the event to the Town's residents; it proposed using the Town website "for general outreach" and stated that the steering committee would communicate with the Town administrator about this. Because of the Board of Selectmen's endorsement, the Town administrator allowed the link from the Town's website to the SUE event website.

On July 20, 2007, after the hyperlink to the SUE website was added to the Town website, Sutliffe wrote a letter to the selectmen requesting that a hyperlink to ERPG's website also be added to the Town website. The selectmen responded with a letter

-15-

on August 14, 2007. The letter stated that the Board of Selectmen needed more information about ERPG before it could decide on Sutfliffe's request. It requested that Sutliffe provide information about ERPG's mission, a list of its members and officers, and financial statements. It also inquired whether ERPG's meetings and membership were open to the public, when meetings are scheduled, how one joins the group, and how the organization spends the funds it raises. The request essentially paralleled the information that had been voluntarily provided to the Board of Selectmen by the SUE steering committee.

On August 21, 2007, Sutliffe responded by requesting: (1) that the Town explain under what authority it could require such information from ERPG and (2) that it produce evidence that the Board of Selectmen had requested similar evidence from SUE. After the Town failed to respond, plaintiffs amended their complaint to add two claims based on these events.

First, plaintiffs alleged that the Town defendants violated their free association rights under the First Amendment by requesting that Sutliffe disclose certain information about ERPG. The Town claimed this information was necessary in order to allow the Board of Selectmen to decide whether it was appropriate to add the ERPG hyperlink. According to plaintiffs, however, this request was intended merely to harass and intimidate, in violation of the

-16-

First Amendment. See generally Gibson v. Fla. Legislative Investigation Comm., 372 U.S. 539, 544 (1963).

Plaintiffs' second claim was that the Town defendants violated their Free Speech Clause rights by refusing their request to add a link to ERPG's website while simultaneously posting a link to the website of SUE. Plaintiffs argued that the Town turned its website into a designated public forum, and its rejection of ERPG's request could not withstand strict scrutiny. They argued, in the alternative, that the Town engaged in viewpoint discrimination by adding the hyperlink to the SUE website and not to ERPG's and that such viewpoint discrimination would be impermissible even in a nonpublic forum. Plaintiffs characterized SUE as a "private group[] whose views the Town favors," although they provided no support for this characterization or any explanation of what views, if any, SUE espoused.

Defendants again moved to dismiss, and on March 25, 2008, the district court held a hearing on these motions. On April 4, 2008, the court issued an order granting the motions to dismiss as to all the claims of the three plaintiffs added in the second amended complaint and as to the bulk of the claims of the remaining plaintiffs. Sutliffe III, 2008 WL 939183, at *14. The court concluded that the Grimards and Victoria lacked Article III standing because they failed to allege any actual or threatened injury. Id. at *6-7.

-17-

As to the other plaintiffs, the court concluded, first, that the claim added in the first amended complaint regarding the 2006 annual report was barred by collateral estoppel. It reasoned that the state court had decided the propriety of the 2004 annual report, and it found that "[t]here is no reason to believe, even when the allegations of the second amended complaint are taken as true and augmented with all reasonable inferences in the plaintiffs' favor, that the 2006 annual report can be distinguished from the 2004 annual report in any meaningful sense." Id. at *13.

Second, the court concluded that all the remaining claims, except those added in the second amended complaint pertaining to the Town website, were barred by res judicata. It found that the federal case arose from the same cause of action as the earlier state court case, and that the state court case concluded with a final judgment on the merits. Id. at *8-10. Once the three plaintiffs who lacked standing were removed from consideration, moreover, the federal complaint and the state court suit involved the same parties or their privies. Id. at *6-8. All the remaining claims brought in the federal complaint, except for the website claim, were either brought or could have been brought in the state court suit; the claims were thus barred. Id. at *11.

On August 21, 2008, the Town defendants moved for summary judgment on the remaining claims, which pertained to the website. The district court granted summary judgment to the defendants on

November 13, 2008. Sutliffe IV, 2008 WL 4922348, at *12. First, the district court rejected plaintiffs' free association claim. The court found there was no evidence that the Town's disclosure request would have resulted in "harassment of current members, a decline in new members, or other chilling of associational rights." Id. at *4 (quoting United States v. Comley, 890 F.2d 539, 544 (1st Cir. 1989)) (internal quotation mark omitted).

Second, the district court rejected plaintiffs' claim under the Free Speech Clause. The court rejected plaintiffs' argument that the Town turned its website into a designated public forum by adding the SUE link while rejecting the ERPG link. Id. at *5-8. Viewing the Town website as a nonpublic forum, it concluded that the Town's actions were reasonable and there was no evidence of viewpoint discrimination. Id. at *8-11.

## II.

We review de novo the district court's grant of a motion to dismiss under Fed. R. Civ. P. 12(b)(6), accepting as true all well-pleaded facts in the complaint and drawing all reasonable inferences in the plaintiffs' favor. Gargano v. Liberty Int'l Underwriters, Inc., No. 08-2287, ___ F.3d ___, 2009 WL 2020408, at *2 (1st Cir. July 14, 2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl.

-19-

Corp. v. Twombly, 550 U.S. 544, 570 (2007)); see also Gargano, 2009 WL 2020408, at *2.

We also review de novo the district court's grant of summary judgment, drawing all reasonable inferences in favor of the non-moving party while ignoring "conclusory allegations, improbable inferences, and unsupported speculation." Sullivan v. City of Springfield, 561 F.3d 7, 14 (1st Cir. 2009) (quoting Prescott v. Higgins, 538 F.3d 32, 39 (1st Cir. 2008)) (internal quotation marks omitted). For review of both summary judgment and dismissal under Rule 12(b)(6), we may affirm on any basis apparent in the record. Cook v. Gates, 528 F.3d 42, 48 (1st Cir. 2008); CMI Capital Mkt. Inv., LLC v. Gonázlez-Toro, 520 F.3d 58, 65 (1st Cir. 2008).

Plaintiffs raise three arguments on appeal. They challenge the district court's ruling, in its April 4, 2008, order, dismissing for lack of standing the claims of the Grimards and Victoria, the three plaintiffs added in the first amended complaint. They also challenge the district court's ruling, in the same order, dismissing the bulk of the remaining plaintiffs' claims under the doctrine of res judicata. Finally, they challenge the November 13, 2008, grant of summary judgment to the defendants on plaintiffs' Free Speech Clause claim pertaining to the Town website.

Plaintiffs do not challenge the court's dismissal on collateral estoppel grounds of their claim relating to the 2006

annual report. Nor do they challenge the court's ruling on their free association claim.

A.        Dismissal of the Added Plaintiffs' Claims for Lack of Standing

The doctrine of constitutional standing "reflect[s] th[e] fundamental limitation" of judicial power to "Cases" and "Controversies," under Article III of the Constitution. Summers v. Earth Island Inst., 129 S. Ct. 1142, 1148-49 (2009); accord DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 342 (2006). The "irreducible constitutional minimum of standing contains three elements": (1) that the plaintiff suffered an "injury in fact," (2) that there is a "causal connection between the injury and the conduct complained of," and (3) that it is "likely" that the injury will be redressed by the requested relief. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992); accord DaimlerChrysler, 547 U.S. at 342; Valley Forge Christian College v. Ams. United for Separation of Church & State, Inc., 454 U.S. 464, 472 (1982). "The burden of stating facts sufficient to support standing rests with the party seeking to assert federal jurisdiction." Sea Shore Corp. v. Sullivan, 158 F.3d 51, 54 (1st Cir. 1998); see also Lujan, 504 U.S. at 561.

"Injury in fact" is "an invasion of a legally protected interest" that is both "concrete and particularized," Lujan, 504 U.S. at 560, and "actual or imminent, not 'conjectural' or 'hypothetical,'" id. (quoting Whitmore v. Arkansas, 495 U.S. 149,

-21-

155 (1990)) (internal quotation marks omitted). Thus, plaintiffs must "show that [they] personally ha[ve] suffered some actual or threatened injury." Valley Forge, 454 U.S. at 472 (quoting Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 99 (1979)) (internal quotation mark omitted).

The district court correctly concluded that the three plaintiffs added in the second complaint could not show any actual or imminent injury. As to actual injury, plaintiffs argue, as they did before the district court, that defendants "have denied them access to taxpayer-financed fora for purposes of expressing views contrary to those of the defendants." But the complaint alleges only that Sutliffe and ERPG were denied access to these fora; it does not allege that the Grimards or Victoria were in any way involved in the other plaintiffs' stymied efforts to access the "fora" -- to the contrary, it explicitly states that each of the three added plaintiffs had "no affiliation with [ERPG]." Nor does the complaint allege that the Grimards or Victoria made any independent attempts to gain access to these channels of communication. As such, there is no basis whatsoever for plaintiffs' claim that the Grimards or Victoria suffered actual injury. See Pagán v. Claderón, 448 F.3d 16, 35 (1st Cir. 2006).

As to imminent injury, plaintiffs' claim fails for similar reasons. Plaintiffs argue that the Grimards and Victoria meet the "injury in fact" requirement because, "just like the other

plaintiffs, [they] wish to participate in the taxpayer financed fora for the expression of views that the School and Town defendants have opened." But the complaint is devoid of any such allegation, as the plaintiffs conceded before the district court at oral argument. And even if plaintiffs had alleged that the Grimards and Victoria "wished to participate" in these fora, this would not be sufficient. Such nebulous "'some day' intentions -- without any description of concrete plans, or indeed even any specification of when the some day will be -- do not support a finding of . . . 'actual or imminent' injury." Lujan, 504 U.S. at 564; accord Summers, 129 S. Ct. at 1151; see also Port Washington Teachers' Ass'n v. Bd. of Educ., 478 F.3d 494, 500 (2d Cir. 2007).[6]

B.        Dismissal of Plaintiffs' Claims on Res Judicata Grounds

The district court's dismissal of all the remaining plaintiffs' claims besides those pertaining to the Town website and the 2006 annual report was correct.

"Under federal law, 'a federal court must give to a state-court judgment the same preclusive effect as would be given

---

[6]     Plaintiffs' reliance on Osediacz v. City of Cranston, 414 F.3d 136 (1st Cir. 2005), is misplaced. Osediacz recognized that "prudential standing concerns are relaxed in certain facial challenges implicating the First Amendment." Id. at 141 (emphasis added). But plaintiffs have not raised any sort of facial challenge. More importantly, we explicitly recognized in Osediacz that even in the particular context of such challenges, "a litigant still must demonstrate that she satisfies the constitutional minima essential to establish standing." Id. (emphasis added); see also IMS Health Inc. v. Ayotte, 550 F.3d 42, 49-50 & n.5 (1st Cir. 2008).

that judgment under the law of the state in which the judgment was entered.'" Torromeo v. Town of Fremont, 438 F.3d 113, 115-16 (1st Cir. 2006) (quoting Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 81 (1984)). Thus, we look to New Hampshire law to determine whether the plaintiffs' earlier state court suit bars their claims in the present federal suit. Id. Under New Hampshire law, res judicata "precludes the litigation in a later case of matters actually decided, and matters that could have been litigated, in an earlier action" when the following three elements are met: "(1) the parties must be the same or in privity with one another; (2) the same cause of action must be before the court in both instances; and (3) a final judgment on the merits must have been rendered in the first action." Meier v. Town of Littleton, 910 A.2d 1243, 1245 (N.H. 2006); accord Torromeo, 438 F.3d at 116.

As to the first requirement, the federal suit involves four plaintiffs who were not parties to the state court suit: Sisson, the Grimards, and Victoria. It also involves a number of additional defendants. Plaintiffs do not contest Sisson, who was a member of ERPG at all relevant times, was in privity with the state court plaintiffs, Sutliffe and ERPG; nor did they contest this point before the district court. Nor do they argue that the additional defendants cannot assert res judicata. Plaintiffs' only argument is that the requirement is not met because the Grimards and Victoria were neither parties nor in privity with parties to

-24-

the state court suit. Because we find that the district court properly dismissed these three added plaintiffs for lack of standing, plaintiffs' argument necessarily fails.

As to the second requirement, plaintiffs argue that the state court suit did not involve the same cause of action as the federal suit because the federal suit encompassed factual allegations that were not present in the state suit. We disagree.

"New Hampshire law considers two causes of action to be the same for purposes of res judicata when they arise from the same factual transaction." Patterson v. Patterson, 306 F.3d 1156, 1159 (1st Cir. 2002) (citing ERG, Inc. v. Barnes, 624 A.2d 555, 558 (N.H. 1993)). The term "transaction" has not been precisely defined, see Patterson, 306 F.3d at 1159, 1160 n.1, but the New Hampshire Supreme Court has stated that "'[c]ause of action' has a broad transaction definition in the res judicata context," Brzica v. Trs. of Dartmouth Coll., 791 A.2d 990, 1000 (N.H. 2002). The fact that a second suit contains some additional factual allegations does not mean it does not arise from the same factual transaction. Two claims arise from the same transaction so long as "[n]o material fact is alleged in action No. 1 that was not alleged in action No. 2." Patterson, 306 F.3d at 1159-60 (alteration in original) (emphasis added) (quoting E. Marine Constr. Corp. v. First S. Leasing, Ltd., 525 A.2d 709, 713 (N.H. 1987)) (internal quotation marks omitted). "Res judicata will bar a second action

-25-

even though the plaintiff is prepared in the second action to present evidence or grounds or theories of the case not presented in the first action."  Brzica, 791 A.2d at 1000.

The Restatement (Second) of Judgments § 24 (1982)[7] states that "the concept of a transaction is . . . used in the broad sense" and "the expression connotes a natural grouping or common nucleus of operative facts." Id. cmt. b.; see also id. ("Among the factors relevant to a determination whether the facts are so woven together as to constitute a single claim are their relatedness in time, space, origin, or motivation, and whether, taken together, they form a convenient unit for trial purposes.")  Moreover, "[w]hen a defendant is accused of . . . acts which though occurring over a period of time were substantially of the same sort and similarly motivated, fairness to the defendant as well as the public convenience may require that they be dealt with in the same action," and the events are said to "constitute but one transaction." Id. cmt. d.

Here, it is clear that plaintiffs' claims, with the exception of the website and the 2006 annual report claims, constituted the same factual transaction as the claims brought before the state court.  Plaintiffs claim is essentially that Town and school officials violated their First Amendment rights "by

_____

[7]     The New Hampshire Supreme Court has repeatedly looked to this section of the Restatement when defining res judicata. Patterson, 306 F.3d at 1160.

-26-

opening fora for the expression of views on spending" while "refus[ing] to allow the plaintiffs to express their contrary views regarding spending through such taxpayer-financed fora." This is precisely the same claim that the plaintiffs presented to the state court in 2005. The fact that plaintiffs' federal complaint is not based on the 2004 annual report but on allegations of a series of closely related events which occurred between 2003 and 2005 does not defeat res judicata. These allegations are largely identical to the evidence in Exhibit 1, which the plaintiffs presented to the state court, in conjunction with the 2004 annual report, as illustrative of how they were "denied [access] from all angles, from the selectmen, from the school committee, [and] from any other planning board or conservation commission." To the extent that the plaintiffs now present further examples of their basic claim that they did not present to the state court, these added facts are substantially of the same sort and similarly motivated and are closely tied in time, space, and origin. Thus, the two cases involve the same cause of action. See Brzica, 791 A.2d at 999-1000; see also Fiumara v. Fireman's Fund Ins. Cos., 746 F.2d 87, 91 (1st Cir. 1984) (applying New Hampshire res judicata law); cf. In re Appeal of Univ. Sys. of N.H. Bd. of Trs., 795 A.2d 840, 843-44 (N.H. 2002).

As to the third requirement, plaintiffs argue that the state court litigation did not result in a final judgment on the

merits because the state court limited its review to the statements in the 2004 annual report. Thus, they argue, there was no final judgment on plaintiffs' numerous other allegations, such as those relating to the Cool News newsletter, other mailers, and the events that occurred at the March 8, 2005, election. Plaintiffs' argument confuses the requirements of res judicata with those of collateral estoppel, as the district court properly noted. Res judicata does not require a final judgment on the merits as to every specific claim to be barred; rather, so long as the previous action concluded with a final judgment on the merits, res judicata extends to "bar[] the relitigation of any issue that was, or might have been, raised in respect to the subject matter of the prior litigation." Grossman v. Murray, 681 A.2d 90, 93-94 (N.H. 1996) (emphasis in original) (quoting Dennis v. R.I. Hosp. Trust Nat'l Bank, 744 F.2d 893, 898 (1st Cir. 1984), abrogated on other grounds by Salve Regina Coll. v. Russell, 499 U.S. 225 (1991)) (internal quotation marks omitted).

All of plaintiffs' claims, excluding those pertaining to the Town website and the 2006 annual report, could have easily been brought as part of the state court action. Almost all of plaintiffs' allegations in this suit are based on evidence that actually was presented to the state court. Seven of the exhibits attached to plaintiffs' federal complaint were included in the packet of materials presented to the state court that was labeled

Exhibit 1.  These include the Cool News newsletters from February and March 2004, the photographs from the March 8, 2005, election, the March 2004 and March 2005 school mailers, and the school postage statements.  Yet another exhibit, Sutliffe's January 31, 2005, letter, was attached to the original state court petition.

Plaintiffs argue that they could not have raised their claim regarding the events that took place during the March 8, 2005, election because these events occurred after the original state court petition was filed.  But plaintiffs were able to present these events to the state court as evidence, and nothing prevented them from amending their petition to encompass this allegation -- or any of the other allegations presented in this case.  See Fiumara, 746 F.2d at 92 ("[A]ll of the events which define the federal complaint occurred in the period before the state trial and were at least generally hinted at during that trial.  If they were not then litigated as hotly as the plaintiff would now wish, they plainly could have been."); see also Brzica, 791 A.2d at 999-1000.

Thus, the district court did not err in its res judicata ruling.

We add a final note. Res judicata is not merely a legal technicality.  Rather, the doctrine is rooted in essential considerations of fairness and judicial economy.  See E. Marine Constr., 525 A.2d at 711.  As the Supreme Court has stated, res

judicata serves the "dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation."  Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 (1979).  Significant resources have already been spent litigating this claim before the state court -- by both the taxpayers whose taxes support the New Hampshire courts and by the defendants who were brought into court (and who, incidently, are also taxpayer-supported in this case).  It would be not only unfair but also wasteful for plaintiffs to be allowed to take another shot at these same claims, this time in the federal system.

C.      Grant of Summary Judgment on Plaintiffs' Town Website Free Speech Clause Claim

We turn now to the district court's November 13, 2008, grant of summary judgment to the defendants on plaintiffs' claim that the Town's refusal to add a hyperlink to ERPG's website from the official Town website violated plaintiffs' First Amendment Free Speech Clause rights.  We affirm the district court's decision but on different grounds: plaintiffs' claim fails because the Town defendants' actions, in setting up and controlling a town website and choosing not to allow the hyperlinks, constituted government speech.

The government speech doctrine, as applied in the recent case of Pleasant Grove City v. Summum, 129 S. Ct. 1125 (2009), controls our analysis.  In Summum, the Court held that while "[t]he

Free Speech Clause restricts government regulation of private speech[,] it does not regulate government speech." Id. at 1131. "[T]he Government's own speech . . . is exempt from First Amendment scrutiny." Id. (alteration and omission in original) (quoting Johanns, 544 U.S. at 553) (internal quotation marks omitted); accord, e.g., Page v. Lexington County Sch. Dist. One, 531 F.3d 275, 280 (4th Cir. 2008); People for the Ethical Treatment of Animals, Inc. v. Gittens, 414 F.3d 23, 28 (D.C. Cir. 2005); see also 5 R.D. Rotunda & J.E. Nowak, Treatise on Constitutional Law § 20.11(d) (4th ed. 2008). "A government entity has a right to 'speak for itself.'" Summum, 129 S. Ct. at 1131 (quoting Bd. of Regents of the Univ. of Wis. Sys. v. Southworth, 529 U.S. 217, 229 (2000)). In so doing, "[i]t is entitled to say what it wishes," id. (quoting Rosenberger v. Rector & Visitors of the Univ. of Va., 515 U.S. 819, 833 (1995)) (internal quotation marks omitted), and "to select the views that it wants to express," id. (citing Rust v. Sullivan, 500 U.S. 173, 194 (1991)).

Furthermore, the Court in Summum held that the government speech doctrine may apply even when the government uses other parties to express its message. "A government entity may exercise [the] same freedom to express its views [even] when it receives assistance from private sources for the purposes of delivering a government-controlled message." Summum, 129 S. Ct. at 1131; accord Johanns, 544 U.S. at 562; Rosenberger, 515 U.S. at 833; see also

-31-

Rust, 500 U.S. at 196-200. "[W]here the government controls the message, 'it is not precluded from relying on the government-speech doctrine merely because it solicits assistance from nongovernmental sources.'" Summum, 129 S. Ct. at 1131 (quoting Johanns, 544 U.S. at 562).

More specifically, Summum makes it clear that when the government uses its discretion to select between the speech of third parties for presentation through communication channels owned by the government and used for government speech, this in itself may constitute an expressive act by the government that is independent of the message of the third-party speech. In Summum, the Court concluded that by accepting a privately donated monument for placement in a city park, while exercising its discretion and rejecting other proposed monuments, a city engaged in its own expressive conduct. Summum, 129 S. Ct. at 1133-36. By choosing which monuments to place in the public park, the city conveyed an important government message about the identity of the city. Id. at 1133-34. This message, the Court reasoned, did not necessarily have to "coincide with the thinking of the monument's donor or creator." Id. at 1136. The city effectively controlled its message because it exercised "final approval authority" over the selection of the monuments. Id. at 1134 (quoting Johanns, 544 U.S. at 561).

Thus, even though many of the monuments in the city's park "were not designed or built by the City and were donated in completed form by private entities," the city's actions were government speech.  Id.; accord United States v. Am. Library Ass'n, 539 U.S. 194, 204-05 (2003) (plurality opinion) (applying the government speech doctrine to "a public library's exercise of judgment in selecting the material it provides to its patrons"); Nat'l Endowment for the Arts v. Finley, 524 U.S. 569, 585-86 (1998) (upholding the National Endowment for the Arts's use of content-based criteria in deciding which projects to fund); Ark. Educ. Television Comm'n v. Forbes, 523 U.S. 666, 674 (1998) (citations omitted) ("When a public broadcaster exercises editorial discretion in the selection and presentation of its programming, it engages in speech activity.  Although programming decisions often involve the compilation of the speech of third parties, the decisions nonetheless constitute communicative acts.");[8] see also Gittens, 414 F.3d at 28-30 (applying government speech doctrine to a government entity's use of editorial discretion to select between privately submitted public art exhibits and holding that this choice constituted a communicative act that was independent of the message of any of the privately submitted exhibits).

_____

[8]    There is no claim in this case that there is any statute requiring New Hampshire towns and school systems to present opposing points of view through their channels of communication, akin to the FCC's fairness doctrine.  See generally Red Lion Broad., Co. v. FCC, 395 U.S. 367, 369 (1969).

Similarly, in this case, the Town engaged in government speech by establishing a town website and then selecting which hyperlinks to place on its website. The Town created a website to convey information about the Town to its citizens and the outside world and, by choosing only certain hyperlinks to place on that website, communicated an important message about itself. The Town did so even more directly than did the city in Summum, which the Court found to have conveyed a message about itself by choosing which privately funded monuments to place in the city park. See Summum, 129 S. Ct. at 1134, 1136; see also Page, 531 F.3d at 285. This expressive activity was independent of the specific content of the websites that were hyperlinked from the Town's website. Also like the city in Summum, the Town defendants effectively controlled the content of this message by exercising "'final approval authority' over the[] selection" of the hyperlinks on the website. Summum, 129 S. Ct. at 1134 (quoting Johanns, 544 U.S. at 561). It is undisputed that hyperlinks were only added to the website with the approval of the Board of Selectmen.

Plaintiffs' attempt to compare their website to the website for SUE fails. The hyperlink to SUE was to a state university-sponsored event, which received Town approval. Thus, the link was from a government website to another government-sponsored website and not to a private website. Further, the hyperlink was to a Town-sponsored, nonpartisan event. By contrast

-34-

to the approved link, plaintiffs' website contained partisan political speech, a category to which the Town had historically declined to provide hyperlinks regardless of the viewpoint expressed.

To be sure, there may be limits[9] to the government speech doctrine, as to the criteria used when the government chooses to provide hyperlinks to particular private speech and not other private speech. But this is not even arguably such a case, nor is it a case of viewpoint discrimination. Any claim of viewpoint discrimination that plaintiffs could raise would be based entirely on the Town's posting of the SUE hyperlink. Plaintiffs have not argued, before the district court or on appeal, that their claim of a violation under the Free Speech Clause is evidenced by the inclusion of any of any other external links. And they have offered no convincing explanation for how the decision to add a link to the website for SUE supports a claim for viewpoint

_____

[9] There are certainly other restraints on the government in a case such as this. Summum, 129 S. Ct. 1132. If the voters do not like those in governance or their government speech, they may vote them out of office, see Southworth, 529 U.S. at 235, or limit the conduct of those officials "by law, regulation, or practice," Summum, 129 S. Ct. at 1132. The Establishment Clause is another restraint on government speech, id., and the Equal Protection Clause may be as well.

We note, furthermore, that this case presents no claim of compelled funding from private actors of government speech, see Johanns, 544 U.S. at 557-59. Indeed, this case presents the reverse situation -- an attempt to compel the government to provide access to private speech on government-owned communication channels.

discrimination.  Contrary to plaintiffs' characterization, SUE was not a private group with a viewpoint contrary to ERPG's; rather, it was an event conducted as part of a statewide program of the state university, which the Town had endorsed and provided financial sponsorship for.  Plaintiffs have never identified any viewpoint espoused by SUE, much less how such a purported viewpoint was favored by the Town over ERPG's viewpoint.  We do not engage issues that are not presented by the case.

The fact that the Town did not have a formal, written policy in place as to which hyperlinks it would place on its website until after Sutliffe made his request is irrelevant to whether the Town's actions constitute government speech.  Indeed, in Summum, the city similarly did not adopt an express policy until after it had rejected the plaintiff's monument.  Summum, 129 S. Ct. at 1134 ("[T]he City has now expressly set forth the criteria it will use in making future selections."  (emphases added)).  Far from finding that this weakened the city's claim that it had engaged in government speech, the Court treated this fact as further evidence that the city was effectively controlling its message.  See id.; see also Page, 531 F.3d at 278.

Moreover, the Town did have an unwritten policy of only adding links that "would promote providing information about the Town," while refusing to add links that were "political or advocate[d] for certain candidates."  Plaintiffs argue that this

policy is belied by actual practice, but they conceded before the district court that their only support for this assertion is the addition of the SUE link. Further, plaintiffs have never argued that the purported lack of a clear policy is evidenced by the inclusion of any other hyperlinks on the Town website. And plaintiffs have never explained how adding a link to the website of SUE, which was a Town-sponsored event and civic in nature, contradicted this established but unwritten policy.[10]

Our conclusion that the Town's actions on these facts constituted government speech is consistent with the view of at least one other circuit.[11] In a pre-Summum decision, the Fourth Circuit last year held in Page v. Lexington County School District One that the government's choice to set up hyperlinks to the websites of private groups on a school district's website was

---

[10] This case is not about government dictating to private speakers what they must include in their presentations, see Hurley v. Irish-American Gay, Lesbian, & Bisexual Group of Boston, 515 U.S. 557 (1995), but the contrary: plaintiffs are trying to dictate to the government what it must include in its presentation. Plaintiffs' argument in fact raises risks to values protected by the First Amendment. They argue the Town must have explicit criteria for choosing to allow links, but they no doubt would object to the Town telling them no link would be allowed unless they changed the content of their message.

[11] We do not consider the alternate analysis in Putnam Pit, Inc. v. City of Cookeville, 221 F.3d 834 (6th Cir. 2000), which was decided before the Supreme Court clarified the government speech doctrine in Johanns, American Library Association, and Summum. In Putnam, the court analyzed the hyperlinks placed on a city's website in terms of forum analysis. It is not clear whether the government speech doctrine was raised in that case.

government speech. In Page, the school district expressed its opposition to an education bill then pending before the state assembly by adding hyperlinks on its websites to the websites of two private organizations that were also opposed to the bill. Page, 531 F.3d at 278. A citizen who supported the bill brought a § 1983 suit against the school district after the school district rejected his request that he be granted equal access to the website to express his own views. Id. at 279. The court rejected the First Amendment claim on government speech grounds. It found that the school district had established a message and exerted effective control over it, even though third parties were involved. Id. at 283-84. By linking to the other websites, the school district did not incorporate the contents of those websites into its own website but merely furthered its own message by "provid[ing] information that other websites supporting its position existed" and "facilitat[ing] [the] viewing [of] those websites." Id. at 284. Even though the school district could not affect the content of these websites, it maintained the necessary control over its own message by "wholly controll[ing] its own website, retaining the right and ability to exclude any link at any time." Id.

Plaintiffs attempt to frame this case in terms of forum analysis rather than government speech. They argue, as they did before the district court, that the Town created a designated public forum in its website. As we understand their argument, they

claim this designated public forum was created when the Town refused to add the link to ERPG but agreed to add the link to SUE, which showed that there were no clear standards for exclusion or inclusion of third-party links on its website. This, they say, established a government intention to create a designated public forum in its website.[12]

Contrary to plaintiffs' framing of the issue, "public forum principles . . . are out of place in the context of this case." Am. Library Ass'n, 539 U.S. at 205 (plurality opinion). The Town's website is obviously not a traditional public forum. Given that the Internet itself is a "resource [] which did not exist until quite recently," the Town's website "has not 'immemorially been held in trust for the use of the public and, time out of mind, . . . been used for purposes of assembly, communication of thoughts between citizens, and discussing public questions.'" Am. Library Ass'n, 539 U.S. at 205 (omission in original) (quoting Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 679 (1992)); see also Int'l Soc'y for Krishna Consciousness, 505 U.S. at 680 ("[G]iven the lateness with which the modern air terminal has made its appearance, it hardly

---

[12] Plaintiffs also argue that if the Town decided not to post a link to ERPG's website because ERPG's speech was political, this decision violated Buckley v. Valeo, 424 U.S. 1 (1976), since ERPG was not engaged in "express advocacy." This argument is meritless and misconstrues the holding of Buckley. See McConnell v. Fed. Election Comm'n, 540 U.S. 93, 190-92 (2003).

-39-

qualifies for the description of having 'immemorially ... time out of mind' been held in the public trust and used for purposes of expressive activity." (omission in original) (quoting <u>Haque</u> v. <u>Comm. for Indus. Org.</u>, 307 U.S. 496, 515 (1939))); <u>Putnam Pit, Inc.</u> v. <u>City of Cookeville</u>, 221 F.3d 834, 843 (6th Cir. 2000).

Plaintiffs' argument that the Town created a designated public forum in its Town website and the hyperlink to a Town-sponsored event is also misplaced, since there is absolutely no evidence that the Town "intentionally open[ed] a nontraditional forum for public discourse." <u>Del Gallo</u> v. <u>Parent</u>, 557 F.3d 58, 72 (1st Cir. 2009) (quoting <u>Ridley</u> v. <u>Mass. Bay Transp. Auth.</u>, 390 F.3d 65, 76 (1st Cir. 2004)) (internal quotation mark omitted).[13]

The public forum doctrine is not a natural fit for the issues raised by this case. The doctrine "first [arose] in the context of streets and parks," and the Supreme Court has warned against extending it "in a mechanical way" to "very different context[s]," such as this one. <u>Forbes</u>, 523 U.S. at 672-73. We think that analyzing the government's decision to place certain hyperlinks on its website in terms of a doctrine rooted in the government's historic regulation of speech, by private citizens, on real, public property would require a highly strained analogy. <u>See</u>

---

[13]     The question of the Town's intentions is not determined by whether its policy for access is written. <u>See</u> <u>Del Gallo</u>, 557 F.3d at 72.

M.J. Dolan, Why Monuments Are Government Speech: The Hard Case of Pleasant Grove City v. Summum, 58 Cath. U. L. Rev. 7, 42 (2008). Given that the public forum doctrine is already strained and has been criticized, see, e.g., Int'l Soc'y for Krishna Consciousness, 505 U.S. at 693-94 (Kennedy, J., concurring in the judgments); United States v. Kokinda, 497 U.S. 720, 741-43 & n.1 (Brennan, J., dissenting); Del Gallo, 557 F.3d at 69 n.6 (collecting sources), we question whether this analogy would be the appropriate one.

More specifically, the Court has cautioned that the forum doctrine should not be extended beyond the context in which "the open access and viewpoint neutrality commanded by the doctrine is 'compatible with the intended purpose of the property.'" Forbes, 523 U.S. at 672-73 (quoting Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 49 (1983)); accord Summum, 129 S. Ct. at 1137 ("The forum doctrine has been applied in situations in which government-owned property or a government program was capable of accommodating a large number of public speakers without defeating the essential function of the land or the program."). In this case, the Town has created a website with the intended purpose to convey information about itself to its citizens and others, and it has added a limited number of hyperlinks to external sites, approved by the Board of Selectmen, in order to further this purpose. The public forum doctrine could risk flooding the Town website with private links, thus making it impossible for the Town

to effectively convey its own message and defeating the very purpose of the website and the hyperlinks chosen by the Town. Faced with a rule that would force it to open its website to private speech to such a degree that it is unable to communicate its own message, a government entity might reasonably choose to simply eliminate all external links from its website; thus, perversely, application of the forum doctrine in this case could lead to less, not more, speech. See M.J. Dolan, The Special Public Purpose Forum and Endorsement Relationships: New Extensions of Government Speech, 31 Hastings Const. L.Q. 71, 134 (2004) ("Recognizing Internet link selection for city web sites as government speech benefits the speech market overall because a city will have the opportunity to communicate its own vision of city attractions and policies, without being hijacked by private speakers with contrary messages. And given the infinitely open and extensive communication possible on the Internet, exclusion from a particular governmental unit's web site in no way inhibits a private entity's expressive opportunities . . . ."); see also Forbes, 523 U.S. at 681; Del Gallo, 557 F.3d at 75.

Our decision rests on the facts of this case. It is possible there may be cases in which a government entity might open its website to private speech in such a way that its decisions on which links to allow on its website would be more aptly analyzed as government regulation of private speech. See Summum, 129 S. Ct. at

-42-

1138 ("To be sure, there are limited circumstances in which the forum doctrine might properly be applied to a permanent monument -- for example, if a town created a monument on which all of its residents . . . could place the name of a person to be honored or some other private message."); Forbes, 523 U.S. at 675 (distinguishing, within the broader context of public broadcasting, a televised political debate, which "was by design a forum for political speech by the candidates").  But such cases are not before us today and we do not express an opinion on them.  On the facts of this case, the actions of the Town defendants were government speech and did not violate the First Amendment.

III.

The district court's orders of April 4, 2008, and November 13, 2008, are affirmed.

**-Dissenting Opinion Follows-**

**TORRUELLA**, <u>Circuit Judge</u> (Concurring in part and Dissenting in part). I join the majority in affirming the dismissal of the plaintiffs' claims on standing and res judicata grounds, but disagree with its treatment of the plaintiffs' claim concerning the Town's website. The majority concludes that the Town's rejection of the plaintiffs' request to put a link to their organization on the Town's website constitutes government speech not subject to the First Amendment. I disagree with this holding, and have significant qualms with the consequences of the majority's extension of the government speech doctrine to this case. Moreover, because I believe that there are disputed issues of material fact with respect to whether the Town intended to create a public forum on its website and regarding whether the Town engaged in viewpoint discrimination, I further dissent from the panel's conclusion on these two issues.

## A. Government Speech

The majority holds that the Town's website, and the Town's rejection of the plaintiffs' request to add a link to their organization on that website, constitute government speech not subject to the First Amendment. In support of this position, the government cites the Supreme Court's recent decision in <u>Pleasant Grove City</u> v. <u>Summum</u>, 129 S. Ct. 1125 (2009). As discussed in the majority opinion, <u>Summum</u> concerned a public park that contained permanent monuments privately donated by third parties. Summum, a

-44-

religious organization, sought to add a permanent monument to the park espousing its views,[14] but the city rejected this request, claiming inter alia that "its practice was to limit monuments in the Park to those that 'either (1) directly relate to the history of Pleasant Grove, or (2) were donated by groups with longstanding ties to the Pleasant Grove community.'" Id. at 1130 (citations and quotation marks omitted). The following year the city "passed a resolution putting this policy into writing." Id. The Supreme Court held that "[p]ermanent monuments displayed on public property typically represent government speech," and that, as such, the city's actions were not subject to the Free Speech Clause. Id. at 1132.

The majority relies on Summum for the proposition that "when the government uses its discretion to select between the speech of third parties for presentation through communication channels owned by the government and used for government speech, this in itself may constitute an expressive act by the government that is independent of the message of the third-party speech." (Op. at 32). Indeed, as the majority notes, the Supreme Court has upheld a number of instances of governmental discrimination of third-party speech as part and parcel of government speech, from "a public library's exercise of judgment in selecting the material it

_____

[14]The proposed monument would contain the "Seven Aphorisms of SUMMUM," which are "[c]entral to Summum religious belief and practice." Id. at 1129-30 & n.1.

-45-

provides to its patrons," see United States v. Am. Library Ass'n, 539 U.S. 194, 205 (2003), to a public broadcaster's "selection and presentation of" debate participants. See Ark. Educ. Television Comm'n v. Forbes, 523 U.S. 666, 673 (1998).

In the present case, the majority holds that the Town's actions constitute "government speech" because the Town "establish[ed]" a website "to convey information about the Town to its citizens and the outside world, and by choosing only certain hyperlinks to place on that website, communicated an important message about itself." (Op. at 33-34). Moreover, the majority reasons that, as in Summum, the Town similarly did not adopt an express policy concerning what links it would put on its website until after it had rejected the plaintiffs' speech. See 129 S. Ct. at 1134. Following Summum, the majority views the ex post adoption of a policy as "further evidence that the city was effectively controlling its message." (Op. at 36). Finally, and although the plaintiffs dispute this, the majority concludes that the Town, prior to its written policy, had an "unwritten policy of only adding links that 'would promote providing information about the Town,' while refusing to add links that were 'political or advocate[d] for certain candidates.'" (Id. (emphasis added)).

I disagree that the government speech doctrine necessarily applies to this case. The Court in Summum emphasized that "[t]here may be situations in which it is difficult to tell

whether a government entity is speaking on its own behalf or is providing a forum for private speech." 129 S. Ct. at 1132. I believe that this is such a case. As I argue below, there is a disputed issue of material fact over whether the Town's actions constituted government speech or, as the plaintiffs contend, the designation of a public forum as a result of the opening up its website to outside links. There is also a disputed issue of material fact over whether the Town engaged in viewpoint discrimination.

This case also differs from Summum in two other important respects. Although Summum similarly involved an unwritten policy of exercising discretion, the Summum Court also relied upon the history of privately donated monuments to support its conclusion that "the general government practice with respect to donated monuments has been one of selective receptivity." Id. at 1133. There is no such history to support the Town's practice here. The Summum Court further noted, in response to "the legitimate concern that the government speech doctrine not be used as a subterfuge for favoring certain private speakers over others based on viewpoint," that formal adoption by the city of the "message" contained in privately donated monuments was not necessary, since the city's taking of ownership of the monuments "provided a more dramatic form of adoption than the sort of formal endorsement that respondent would demand." Id. at 1134. Unlike in Summum, there were no

actions taken by the Town with respect to third party links that mirrors the "dramatic form of adoption" that occurs when a Town takes ownership of a privately-donated monument.  The majority claims that the Town's acceptance of links is more direct than assuming ownership of a privately donated monument, but does not explain why.

What is lacking in this "recently minted" area of the law, see Summum, 129 S. Ct. at 1139 (Stevens, J., concurring), are any limiting principles.  The majority extends the discrimination-as-government-speech doctrine to links on a government website.  At least one case, pre-Summum, has also taken that route, although in that case it was clear that the government was engaging in its own speech activity.  See Page v. Lexington Cty. Sch. Dist. One, 531 F.3d 275 (4th Cir. 2008) (holding, among other things, that selection of links on a school website constituted government speech where the school board only added to its site third party links in support of the board's opposition to a pending bill).  By contrast, in the present case the majority extends the doctrine to a situation where, in my view, it was not clear that the government was engaging in speech at the time it was acting, and only justified its actions after the fact.  The majority's position has the potential of permitting a governmental entity to engage in viewpoint discrimination in its own governmentally-owned channels so long as the governmental entity can cast its actions as its own

-48-

speech after the fact.  What is to stop a governmental entity from applying the doctrine to a parade?  Cf. Hurley v. Irish-American Gay, Lesbian, & Bisexual Group of Boston, 515 U.S. 557, 574 (1995) (holding that state public accommodations law could not mandate inclusion of groups into parade, as parade was expressive conduct, and "like a composer, the [parade organizer] selects the expressive units of the parade from potential participants").  Or official events?  See Weise v. Casper, No. 05-02355, 2008 WL 4838682 at *8 (D. Colo. Nov. 6, 2008) (applying government speech doctrine to dismiss claim that plaintiffs' free speech rights were violated when they were prevented from attending a speech given by the President because the plaintiffs' truck contained a bumper sticker stating "No More Blood for Oil").  It is nearly impossible to concoct examples of viewpoint discrimination on government channels that cannot otherwise be repackaged ex post as "government speech."

The majority claims that there may be limits to the doctrine, "as to the criteria used when the government chooses to provide hyperlinks to particular private speech and not other private speech." (Op. at 35).  I believe that this is one of those cases, and, as I argue below, there is sufficient evidence in this case of viewpoint discrimination to permit the issue to go before a jury.

The majority further claims that "there are certainly other restraints on the government in a case such as this."  (Op.

-49-

at 35 n.9).  It contends in a footnote that "[i]f the voters do not like those in governance or their government speech, they may vote them out of office," or, as suggested in Summum, "limit the conduct of those officials 'by law, regulation, or practice.'" (Id. at 34-35 n.9 (quoting Summum, 129 S. Ct. at 1132)).[15]  But even this remote avenue for relief through political processes becomes further constrained by expanding the government's ability to silence opposition by narrowing the fora in which opposing views may be expressed.  Indeed, in permitting the government to use its governmentally-owned channels to silence its critics in the name of "government speech," the government speech doctrine, as interpreted by the majority, puts individuals who oppose the government and its actions at a structural disadvantage.  This is akin to allowing the government "to fight freestyle, while requiring the other [side] to follow Marquis of Queensberry rules."  R.A.V. v. City of St. Paul, 505 U.S. 377, 392 (1992).[16]

---

[15]The majority also points to the Establishment Clause as limiting government speech, which has no application here, and to the Equal Protection Clause, which the plaintiffs unsuccessfully invoked here.  See Summum, 129 S. Ct. at 1139 (Stevens, J., concurring) (mentioning the Establishment Clause and the Equal Protection Clause as other "constitutional safeguards [that] ensure that the effect of today's decision will be limited.").

[16]In my view, the better course is to adopt the test proposed by Justice Souter in his concurrence to Summum.  Although he joined the majority in that case, he further noted that:

> To avoid relying on a per se rule to say when speech is governmental, the best approach that occurs to me is to ask whether a reasonable and fully informed observer

## B.  Public Forum

The majority further concludes that the Town's actions with respect to its website could not be interpreted as designating the website as a public forum.  I disagree.  The majority's concludes that "there is absolutely no evidence that the Town 'intentionally open[ed] a nontraditional forum for public discourse.'" (Op. at 40 (quoting Del Gallo v. Parent, 557 F.3d 58, 72 (1st Cir. 2009)).[17]  In doing so, it rejects the plaintiffs' claim that the Town's inclusion of a link to "Speak Up, Epping" ("SUE") at least indicated that "there were no clear standards for exclusion or inclusion of third-party links on its website."  (Id. at 39); see also Ridley v. MBTA, 390 F.3d 65, 104 (1st Cir. 2004)

---

would understand the expression to be government speech, as distinct from private speech the government chooses to oblige by allowing the monument to be placed on public land.

Summum, 129 S. Ct. at 1142 (Souter, J., concurring).  Justice Souter's test has the benefit of preventing ex post rationalization of viewpoint discrimination as government speech to avoid First Amendment scrutiny.  Rather, the actions of the government would be evaluated from the perspective of a reasonable observer, and, as I note below, it is an open question whether a reasonable observer would construe the Town's actions as government speech, as opposed to the designation of a public forum or simple run-of-the-mill viewpoint discrimination.

[17]It goes without saying that I agree with the majority's conclusion that the Town's website is not a traditional public forum. See Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 680 (1992) (defining a "traditional public forum" as one that has "'immemorially . . . time out of mind' been held in the public trust and used for purposes of expressive activity") (omission in original).

(Torruella, J., concurring in part and dissenting in part) ("Courts will hold that the government did not create a public forum only when its standards for inclusion and exclusion are clear . . . .") (citation and quotation marks omitted).  But there were, in fact, no such clear standards.  As the undisputed facts demonstrated, the Town did not adopt any formal policy with respect to links on its website until <u>after</u> the plaintiffs' sought to include its request.  In fact, at oral argument the Town could not provide a definition of what that policy was, running through various definitions.

The majority points to the Town's purported "unwritten policy of only adding links that 'would promote providing information about the Town,' while refusing to add links that were 'political or advocate[d] for certain candidates,'" (Op. at 35), but the plaintiffs vigorously disputed the existence of such a policy, and pointed to the addition of the SUE link as evidence of a willingness to add outside links without such preconditions.[18] While the majority concludes that the addition of the SUE link did not contradict the Town's unwritten policy, I disagree.  In the absence of a written, publicly available policy, one could reasonably infer from the Town's inclusion of the SUE link, without any public process detailing the conditions of inclusion, that it

_____

[18]In fact, the very name given to this event, "Speak Up, Epping," shows that the Town sought to encourage participation in civic discourse, yet the Town proceeded to exclude the plaintiffs' participation.

-52-

was willing to open up its website to outside links.  See Ridley,

390 F.3d at 104 (Torruella, J., concurring in part and dissenting

in part) ("In determining whether the government has designated

property to be a public forum, we have previously stated that

'actual practice speaks louder than words.'" (quoting Grace Bible

Fellowship, Inc. v. Me. Sch. Admin. Dist. No. 5, 941 F.2d 45, 47

(1st Cir. 1991))).[19]  Given this reasonable inference of the Town's

actions, I would have permitted the jury to address this question

of intent, rather than affirm the grant of summary judgment here.

See Noonan v. Staples, 556 F.3d 20, 31 (1st Cir. 2009) ("[W]here

'motive and intent play a leading role, summary judgment should not

be granted.'") (citation omitted).

I further disagree with the majority's conclusion that

"the public forum doctrine is not a natural fit for the issues

raised in this case."  (Op. at 41).  I agree with the majority that

forum analysis "should not be extended beyond the context in which

'the open access and viewpoint neutrality commanded by the doctrine

is compatible with the intended purpose of the property.'" (Op. at

40 (quoting Forbes, 523 U.S. at 672-73).  However, the majority's

_____

[19]Although the majority notes, correctly, that the plaintiffs
only relied upon the inclusion of the SUE link in support of their
claims, at oral argument the Town admitted that it permitted the
inclusion of links of other organizations, namely the Chamber of
Commerce, that took "'political'" stances.  It is unclear why we
are required to ignore such evidence on an issue of such
constitutional importance.

reasoning for why it should not be extended to this context takes too limited view of what can be accomplished on the web.

The majority writes that converting the Town website into a public forum "could risk flooding the Town website with private links, thus making it impossible for the Town to effectively convey its own message, and defeating the very purpose of the website and the hyperlinks chosen by the Town."  (Op. at 41).  It further argues that this flood of third party links may force the Town to take down its website altogether.

I see no reason why this would have to be the case. Unlike a physical space, where there are limitations on the amount of speakers it can contain, the Town's website can accommodate a near infinite number of links, save for minimal storage and server costs.  Moreover, there is no reason why a Town cannot, consistent with viewpoint neutrality, impose time, manner, and place restrictions which could contain the flood of private links the majority imagines will result from opening up the Town's website to third parties.  In fact, consistent with the government speech doctrine, the Town could engage in preferential treatment of its own speech on the website while accommodating the speech of others. And although, as correctly noted by the majority, a citizen can find another outlet on the internet to express its views, there is a significant benefit to public debate in allowing a citizen to express his or her views in the same place as the government.  To

-54-

force a citizen to express his or her views elsewhere on the internet would be akin to banishing a citizen from making his views known in city hall, but instead on a street corner outside the building.

## C. Viewpoint Discrimination

The majority finally asserts that this is not a case of viewpoint discrimination, noting that SUE was an event which had received Town approval, did not have a viewpoint, and that the link to SUE was from a governmental website. But what is important is not the status of SUE, but whether the Town's actions in including a link to SUE and then, abruptly, rejecting a similar request by the plaintiffs can support a claim of viewpoint discrimination. The timing of these events, combined with the lack of any clear policy to support the Town's actions and the evident animosity between the plaintiffs and the Town all at least raise an inference of viewpoint discrimination sufficient in my view to at least put the issue before the jury.[20]

For all of the above reasons, I respectfully concur in part and dissent in part.

---

[20]I further cannot ignore the fact that, at oral argument, counsel for the Town struggled to justify the Town's inclusion of a Chamber of Commerce link on the Town's website, but not the plaintiffs' website.